[No. S004617. Crim. No. 23785. Aug. 3, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSE JAMES ANDREWS, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., and Harvey Zall, State Public Defenders, Therene Powell and James A. Uyeda, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Carol Wendelin Pollack, Christine C. Franklin, Donald

E. deNicola and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted defendant Jesse James Andrews of three counts of first degree murder (Pen. Code, § 187),[1] one count of robbery (§ 211), one count of rape (former § 261, subds. 2, 3), and one count of sodomy by foreign object (§ 289). The jury found that he had used a firearm in the commission of each offense. (§ 12022.5.) As to each murder, the jury found true three separate special-circumstance allegations: prior murder conviction (§ 190.2, subd. (a)(2)), multiple murder (§ 190.2, subd. (a)(3)), and robbery-murder (§ 190.2, subd. (a)(17)(i)). The jury also found true the special circumstance allegation that defendant had committed a murder during the commission of a rape. (§ 190.2, subd. (a)(17)(iii).) At the penalty phase, the jury returned a sentence of death for each murder. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) Although we conclude that certain duplicative special-circumstance findings must be stricken, we affirm the judgment in all other respects.

I.

GUILT PHASE FACTS

### A. *The Murders*

On the evening of December 9, 1979, police were summoned to the Los Angeles apartment of Preston Wheeler. There they found the bodies of Wheeler, Patrice Brandon and Ronald Chism. Wheeler had been stabbed in the chest six times and shot in the neck at close range with either a .32- or .357-caliber weapon. His face and head were bruised, and his face had been slashed with a knife. Brandon and Chism had been strangled with wire coat hangers. Their faces were bruised, Chism's extensively. Brandon's anus was extremely dilated, bruised, reddened and torn, consistent with the insertion of a penis shortly before her death. There was also redness around the opening of her vagina, and vaginal samples revealed the presence of semen and spermatozoa. All three victims were bound hand and foot.

Roughly a year later, police arrested Charles Sanders, defendant's accomplice, in connection with these crimes. During his interrogation, Sanders

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

gave both a tape-recorded and a written statement. He later cooperated with the authorities and testified against defendant at trial, pursuant to a plea bargain in which Sanders pleaded guilty to three counts of second degree murder and admitted a gun-use enhancement, in return for which he was promised a sentence of seventeen years to life in prison.

### B. *Sanders's Testimony*

Sanders gave the following testimony. After devising a plan to rob Wheeler, a drug dealer, Sanders and defendant went to see their friend Carol Brooks on the night of December 8, 1979. Brooks lived in the same apartment building as Wheeler. Defendant was armed with a .357 magnum. Sanders had a .38- or .32-caliber automatic furnished by defendant. Following their visit to Brooks, the two men went to Wheeler's apartment. In response to their knocking, Wheeler, who apparently knew defendant, let them in. Also inside the apartment was a woman (Patrice Brandon).

After smoking some marijuana with Wheeler, defendant and Sanders drew their guns. Sanders tied Wheeler and Brandon with belts and socks, put on a pair of gloves, and began to search the apartment for drugs and money. Except for some powder on a saucer which appeared to be cocaine, the search was unsuccessful. Defendant questioned Wheeler, who denied having any drugs or money. Saying he would make Brandon talk, defendant dragged her into the kitchen and closed the door. Sanders remained in the living room with Wheeler.

Initially, Sanders heard defendant talking to Brandon and hitting her; later he heard "breathing as though they were making love." Shortly thereafter, defendant came out of the kitchen. Through the partially open kitchen door, Sanders saw Brandon's pants around her ankles.

Defendant put his gun in Wheeler's mouth. He threatened to kill Wheeler and Brandon unless Wheeler revealed the location of the drugs. Wheeler said the "dope" was in the attic, and pointed out a trap door leading up to it. Sanders climbed into the attic.

While in the attic, Sanders heard two shots. When he came down, defendant told him he had shot Wheeler because the latter had tried to jump out the window. Sanders asked if Wheeler was dead. Defendant responded he was "standing right up" on Wheeler when he fired the gun. Sanders saw blood on Wheeler's neck and chest. He suggested that they clean the apartment and leave. When Sanders asked about Brandon, defendant replied he had killed her before leaving the kitchen.

During the cleanup of the apartment, defendant responded to a knock on the door. Sanders heard the visitor (Ronald Chism) ask if everything was all right and if Wheeler was there. Defendant said Wheeler was home, and invited Chism inside. Defendant then hit Chism on the head, tied him up, and took him into the bathroom. Sanders saw defendant sitting astride Chism's back, joining and separating his clenched fists in a tugging motion, apparently strangling Chism. Sanders could not see what defendant had in his hands.

Thereafter, Sanders saw defendant enter the kitchen and choke Brandon with a wire clothes hanger. Defendant and Sanders then left the apartment and drove away. Defendant gave Sanders some money, saying it was all he had found.

## C. *Brooks's Testimony*

Carol Brooks testified she had known defendant and Sanders for a long time. Her brother was married to Sanders's sister. The night of the murders, defendant and Sanders were at her house between 10 and 11 p.m. Defendant told her they were going to Wheeler's apartment to get some money.

A week or so after the murders, Sanders told Brooks of his involvement in the crimes. Several weeks later, defendant mentioned to Brooks he (defendant) shot Wheeler, took $300, and had sex with Brandon.[2]

## D. *Fingerprint Evidence*

Police fingerprint experts Howard Sanshuck and Donald Keir compared 50 latent prints lifted from Wheeler's apartment with fingerprint and palm print exemplars taken from defendant. They concluded that three of the latent prints were defendant's: a fingerprint on a coffee table in the living room, and a set of left and right palm prints on the kitchen floor. The left palm print was found about an inch from Brandon's body.

Shortly after the murders, Sanshuck's supervisor, Jimmy Cassel, Jr., performed a preliminary examination of the latent prints lifted from the crime scene. At that time, Cassel erroneously marked the prints found on the kitchen floor as Wheeler's but later identified them as belonging to defendant. He explained his earlier examination had been a "very quick run-through." He attributed the erroneous marking to accidentally placing the

---

[2] Brooks was impeached with a 1979 felony conviction for possession and sale of marijuana.

lifts in the wrong pile while going through them. At trial, Cassel saw no similarity between the lifts and Wheeler's prints.

E. *Defense Evidence*

Defendant did not testify. The defense consisted primarily of attempts to undermine Sanders's credibility.

Edward Tate testified he and Sanders began confiding in each other while both were in the Los Angeles County jail in 1981. Sanders told Tate his girlfriend was putting a lot of pressure on him, and he was going to fabricate a story "to shift the weight over" to an unnamed male fighting extradition in Florida.[3] Approximately 18 months later, Tate was transferred to the jail's high security section. There he met defendant, and learned defendant was the person of whom Sanders had been speaking.

Henry Wilds testified that in May 1982—during a poker game with Tate, Sanders and two other inmates nicknamed "Evil" and "Treach"—Sanders, referring to the murders at issue here, said he was going to "put it on a dude" named Chester. When Wilds asked, "You fixin' on lyin' on somebody?," Sanders responded, "Somebody got to ride on this." Wilds then threw down his cards, said he was not going to play with any "snitch-ass dude," and left. Tate partially corroborated Wilds's testimony, saying he remembered Wilds's calling Sanders a lying snitch but could not recall the circumstances under which the accusation was made.

Sanders denied making the statements that Wilds and Tate attributed to him. He did not know anyone named Henry Wilds, but acknowledged that he might know Wilds by another name and that he had played poker with "Evil" and "Treach."

## II.

### GUILT PHASE ISSUES

A. *Admission of Sanders's Tape-recorded Statement*

■ The defense implied during the cross-examination of Charles Sanders that he had lied about the killings. In an effort to rehabilitate him, the prosecution sought to introduce Sanders's written and tape-recorded statements made to the police just after his arrest, both of which were substantially similar to his testimony at trial. The trial court allowed the

---

[3] At that time, defendant was in Florida resisting extradition to California.

prosecution to introduce the tape-recorded statement over defense objection.

Defendant contends admission of the tape recording was prejudicial error. The People respond the tape was admissible on three different theories: (1) as a refutation to a charge of recent fabrication (Evid. Code, § 791, subd. (b)); (2) as a prior consistent statement which preceded a prior inconsistent statement (Evid. Code, § 791, subd. (a)); and (3) pursuant to the "entire act" provisions of Evidence Code section 356. Because we agree with the People's first theory of admissibility, we need not address the others.

Subdivision (b) of Evidence Code section 791 allows the admission of a witness's prior consistent statement when "[a]n express or implied charge has been made that his testimony . . . is recently fabricated or is influenced by bias or other improper motive, and the statement was made *before* the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Italics added.)

Defendant claims the desire to obtain leniency at defendant's expense gave Sanders an incentive to lie. He contends this general motive to fabricate arose before Sanders made the recorded statement, and therefore the statement was inadmissible under subdivision (b) of section 791 of the Evidence Code. However, in his cross-examination of Sanders, defendant attempted to show there was a subsequent specific motive, namely, Sanders's "deal" with the prosecution, which influenced Sanders's testimony.

Defense counsel cross-examined Sanders extensively about the alleged "deal" he had made with the prosecution in 1983, four years after his initial statement to the police. Specifically, counsel questioned Sanders regarding the nature of the charges to which he had pleaded guilty, the sentence he was to receive, and the fact that sentencing had been continued until after defendant's trial. "The mere asking of questions may raise an implied charge of an improper motive . . . ." (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1209 [249 Cal.Rptr. 71, 756 P.2d 795].) Here, defense counsel's questioning of Sanders raised an implicit charge that the "deal" provided Sanders with an additional motive to testify untruthfully. This, in turn, entitled the prosecution to show that Sanders's testimony was consistent with the recorded statement he gave shortly after his arrest but before the "deal" was consummated, that is, before the subsequent, specific motive to fabricate arose. (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1014 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Duvall* (1968) 262 Cal.App.2d 417, 420-421 [68 Cal.Rptr. 708].)

*People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], relied on by defendant, does not compel a contrary conclusion. In

*Coleman,* much of the prosecution's case rested on the testimony of an accomplice who had gone to the police and confessed two months following the commission of the crime. After the defendant had testified the accomplice was lying, the prosecution introduced testimony that the accomplice had made consistent statements to his wife and father just before turning himself in. We held this testimony inadmissible because there was no reason to believe the accomplice's improper motive had not arisen before his statements to his family. In distinguishing an earlier case, *People* v. *Duvall, supra,* 262 Cal.App.2d 417, we pointed out that in *Duvall* "the implied charge of improper motive referred to a specific time, namely, when the accomplice-witnesses were impliedly charged with making a 'deal' with the district attorney." (*People* v. *Coleman, supra,* 71 Cal.2d at p. 1166, fn. 1.) As discussed earlier, this case is analogous to *Duvall,* and thus distinguishable from *Coleman.* Here, as in *Duvall,* the defense accused Sanders of making a "deal" at a specific time, and implied that this "deal" provided Sanders with a motive to testify falsely.[4]

In any event, admission of the tape recording was harmless under the facts of this case. Apart from Sanders's testimony, there was strong evidence connecting defendant to the crimes. His palm print was found on the kitchen floor only an inch from Brandon's body. ■ As we said recently, " '[f]ingerprint evidence is the strongest evidence of identity, and *is ordinarily sufficient alone to identify the defendant.*' " (*People* v. *Johnson* (1988) 47 Cal.3d 576, 601 [253 Cal.Rptr. 710, 764 P.2d 1087], quoting from *People* v. *Gardner* (1969) 71 Cal.2d 843, 849 [79 Cal.Rptr. 743, 457 P.2d 575] (italics in original).) Also, Carol Brooks testified defendant had told her of his participation in the offenses. Brooks said defendant had admitted to her he shot Wheeler, stole money, and had sex with Brandon. Moreover, Sanders's tape-recorded statement was substantially similar to his testimony at trial, and thus was largely cumulative. Based on all of these circumstances, it is not reasonably probable that admission of the tape-recorded statement affected the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[5]

---

[4]Defendant also seeks to find support in *People* v. *Lewis* (1987) 160 Mich.App. 20 [408 N.W.2d 94], where the court held a tape-recorded statement inadmissible under circumstances similar to those present here. However, in Michigan a prior consistent statement may be admitted only to rebut a charge of recent fabrication if "the earlier consistent statement was given at a time prior to the existence of *any* fact which would motivate bias, interest, or corruption on the part of the witness." (*People* v. *Lewis, supra,* 408 N.W.2d at p. 99, italics added.) This is not the case in California.

[5]We reject defendant's argument that prejudice is shown by the fact that there was a hung jury in a prior trial of these charges. Although the tape recording of Sanders's statement was not admitted at the initial trial, the hung jury is more likely the result of other significant differences, such as the defense's exploitation at that trial of the prosecution's last-minute discovery that defendant's palm prints had been found at the scene of the crime.

Defendant also contends that because the tape recording was made on the day of Sanders's arrest when he had an "overwhelming motive" to falsely implicate defendant, the statement was presumptively unreliable as evidence of guilt, and its admission was unconstitutional under *Lee v. Illinois* (1986) 476 U.S. 530 [90 L.Ed.2d 514, 106 S.Ct. 2056]. Defendant's reliance on *Lee* is misplaced. There the high court held that the admission of a codefendant's inculpatory statement without giving the defendant an opportunity for cross-examination violated the Sixth Amendment's confrontation clause. In contrast, here Sanders testified in person, and defendant fully cross-examined him regarding the contents of the statement. (See *California v. Green* (1969) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].) *Lee* in no way suggests that a statement offered under such circumstances is inadmissible.

Defendant further claims that, because the jury was instructed at the penalty phase to "consider all of the evidence which has been received during any part of the trial of this case," Sanders's tape-recorded statement must have undermined the jury's penalty determination. Evidence Code section 791, subdivision (b) permitted the jury to consider the statement both at the guilt and at the penalty phase, and to give it the weight which the jury felt it deserved. Defendant has failed to establish a constitutional bar to this rule.

## B. *Instructions on Accomplice Testimony*

As an accomplice, Sanders's testimony was subject to the rule that a conviction may not be obtained solely on the testimony of an accomplice, but must be based on "other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.) Accordingly, the trial court gave the standard CALJIC instructions on accomplice testimony: CALJIC No. 3.10 (1979 rev.), defining accomplices;[6] CALJIC No. 3.11 (1979 rev.), setting forth the corroboration requirement of section 1111;[7] CALJIC No. 3.12 (1979 rev.), elaborating on the corroboration require-

---

[6] CALJIC No. 3.10 (1979 rev.) provided: "An accomplice is one who [is] [was] subject to prosecution for the identical offense charged against the defendant on trial.

"To be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense."

[7] CALJIC No. 3.11 (1979 rev.) stated: "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense."

As will be discussed later in the opinion, the judge misread this instruction to the jury.

ment;[8] and a slightly modified version of CALJIC No. 3.16 (1979 rev.), stating that Sanders was an accomplice as a matter of law and thus subject to the corroboration requirement.[9] Defendant raised no objections to these instructions, nor did he request any additional instructions on the subject.

Defendant now asserts the trial court erred in (1) failing to instruct the jury on its own motion that the corroboration requirement applied to Sanders's extrajudicial statements as well as to his testimony in court; (2) orally instructing the jury that the corroborating evidence need only connect the accomplice's testimony to the commission of the offense; and (3) giving an unmodified version of CALJIC No. 2.27 (testimony by one witness may be sufficient to prove any fact), thereby inviting the jury to disregard the corroboration requirement. Because the corroboration requirement of section 1111 is a substantial right, we address defendant's claims despite his failure to assert them at trial. (See § 1259; *People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372].)

### 1. *Application of Corroboration Requirement to Extrajudicial Statements*

CALJIC No. 3.11, which is based on section 1111, states that a defendant may not be convicted based on "the *testimony* of an accomplice unless such *testimony* is corroborated." (Italics added.) Similarly, CALJIC No. 3.12 discusses how the *testimony* of an accomplice must be corroborated, and CALJIC No. 3.16 describes the particular witness as an accomplice whose *testimony* must be corroborated. ■ Defendant points out that the prosecution relied not only on accomplice Sanders's testimony in court, but also

---

[8] CALJIC No. 3.12 (1979 rev.) read: "To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the offense which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the offense charged.

"However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the offense charged, or that it corroborate every fact to which the accomplice testifies.

"In determining whether an accomplice has been corroborated, you *must* first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the offense.

"If there is not such independent evidence which tends to connect defendant with the commission of the offense, the testimony of the accomplice is not corroborated.

"If there is such independent evidence which you believe, then the testimony of the accomplice is corroborated." (Italics added.)

As discussed later in the opinion, when the judge read this instruction to the jury, he used the word "may" instead of the italicized word "must."

[9] The modified instruction read: "If the crime of murder or rape or robbery or sodomy by foreign object was committed by anyone, the witness Charles Sanders was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration."

on his tape-recorded statement. He contends this out-of-court statement was also subject to the corroboration requirement, and therefore the trial court erred in failing to so instruct the jury on its own motion. He also argues that, if the jury had concluded the tape-recorded statement was not testimony, it could have improperly relied on the recording itself to provide the requisite corroboration for Sanders's in-court statements. As defendant correctly notes, an accomplice may not corroborate himself. (*People* v. *Bowley* (1963) 59 Cal.2d 855, 859 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].)

Section 1111 applies to an accomplice's out-of-court statements when such statements are used as substantive evidence of guilt. In *People* v. *Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485], we reversed a conviction for discharging a firearm at an inhabited dwelling because the extrajudicial statement of an accomplice had provided the sole evidence linking the defendant to the offense. The trial court in that case admitted the statement as a prior inconsistent statement after the accomplice denied on the witness stand that either he or the defendant had been involved in the commission of the offense. We observed, "[a]lthough section 1111 speaks in terms of 'testimony,' it is instructive to note that courts of this state have focused on the *source* of the statements rather than their evidentiary form in articulating the legislative intent behind that section." (*Id.* at pp. 524-525, italics in original.) We determined that the Legislature's purpose in enacting section 1111 was to prevent convictions based solely on evidence provided by such inherently untrustworthy sources as accomplices. (23 Cal.3d at pp. 524-525; see also *In re Miguel L.* (1982) 32 Cal.3d 100, 108 [185 Cal.Rptr. 120, 649 P.2d 703].) In holding that the accomplice's prior inconsistent statement in *Belton* constituted testimony within the meaning of section 1111, we said: "To conclude that such evidence does not fall within the ambit of section 1111 merely because an out-of-court statement is not, strictly speaking, synonymous with testimony would be to thwart the purposes of that section. Accordingly, applying the basic principle that legislative intent prevails over literal construction, this court concludes that [the accomplice's] prior inconsistent statement constituted 'testimony,' as the term is used in section 1111." (*People* v. *Belton, supra,* 23 Cal.3d at p. 526.) Similarly, here accomplice Sanders's tape-recorded statement was subject to the corroboration requirement of section 1111.

We disagree with defendant that the trial court had a duty to modify, on its own motion, the instructions on accomplice corroboration to provide that they applied to Sanders's out-of-court as well as his in-court statements. The gist of those instructions was that accomplices were to be distrusted, and that their testimony could not furnish the sole basis for a conviction. Neither the trial court nor the parties ever suggested to the jury

that, with respect to the corroboration requirement, it should distinguish between Sanders's out-of-court and in-court statements.[10] We note that when, in the middle of deliberations, the jury asked to rehear the tape-recorded statement, the trial court gave this explanation as to why it had not permitted the tape into the jury room with the other exhibits: "This did not go into evidence in the courtroom, because *that's just like any other testimony given in this courtroom,* and it might unnecessarily highlight it if you had that to play over and over to the exclusion of any other evidence." (Italics added.) Thus, the trial court informed the jury, at a time when it was particularly concerned with the extrajudicial statement, that the tape-recorded statement was "just like any other testimony." In view of the court's instructions and comments, the jury was not likely to misapprehend its obligation to find corroboration for Sanders's statements.[11]

Moreover, even if we assume the trial court erred in failing to give clarifying instructions, such error was harmless. There was ample corroboration for Sanders's statements. Carol Brooks testified that defendant admitted killing Wheeler. Additionally, defendant's palm prints were found on the floor next to the body of victim Brandon. Based on the strength of the corroborating evidence, there is no reasonable probability that the jury would have reached a different result if it had been given the clarifying instructions. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### 2. *Trial Court's Misreading of CALJIC No. 3.11*

■ In reading CALJIC No. 3.11 to the jury, the trial court—apparently inadvertently—substituted the word "testimony" for the word "defendant" towards the end of the instruction, as follows: "A defendant cannot be found guilty based on the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such *testimony* with the commission of the offense." (Italics added.) The italicized word should have been "defendant," as originally stated in CALJIC No. 3.11.

---

[10] We reject defendant's assertion the trial court made such a suggestion when it instructed the jury that "[e]vidence consists of the testimony of witnesses, writings, material, objects, or anything presented to the senses and offered to prove the existence or non-existence of a fact." This instruction provided a general definition of the term "evidence," and did not imply that "testimony" should be narrowly defined. We also reject defendant's claim that the prosecutor invited the jury to use Sanders's extrajudicial statement as corroboration when he told the jury that Sanders "testified to you about what happened . . . and he documented it" with the tape recording. The prosecutor was not discussing the corroboration requirement at the time. He was merely arguing to the jury that Sanders was a credible witness who should be believed.

[11] To avoid any possibility of confusion, when the prosecution relies in whole or in part on the out-of-court statements of an accomplice, the trial court should substitute the word "statement[s]" for "testimony" in CALJIC Nos. 3.11, 3.12, and 3.16, as suggested by the Use Note to CALJIC No. 3.12.

Defendant claims the court's misreading was prejudicial because it significantly changed the thrust of the instruction. Instead of telling the jury it must find other evidence showing that *defendant* committed the offense, the misread instruction told the jury to look for other evidence connecting accomplice Sanders's *testimony* to the commission of the offense. Thus, defendant argues, rather than looking for evidence that defendant was the perpetrator, the jury was likely to look for evidence of Sanders's presence at the crime scene and his observation of the events to which he testified.

The trial court's error in misreading CALJIC No. 3.11 was harmless. The court provided the jury with written copies of all the instructions, including an accurate version of CALJIC No. 3.11. (See *People* v. *McLain* (1988) 46 Cal.3d 97, 111, fn. 2 [249 Cal.Rptr. 630, 757 P.2d 569].) Also among the instructions was CALJIC No. 3.12, elaborating on the corroboration requirement and stating three times that the jury must determine whether there was other evidence tending to connect *defendant* with the commission of the offense.[12] Furthermore, as discussed at page 215, *ante*, the evidence corroborating the accomplice testimony was strong. Therefore any confusion the jury might have had on the question of corroboration would not have affected its deliberations, either at the guilt or the penalty phase.

### 3. *Conflict Between CALJIC No. 2.27 and Accomplice Instructions*

■ Among the instructions given was former CALJIC No. 2.27 (1977 rev.), which read: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact required to be established by the prosecution to be proved solely by the testimony of a single witness, you should carefully review all the testimony upon which the proof of such fact depends." Defendant points out that, in the case of accomplice testimony, the testimony of one witness is *not* sufficient for the proof of any fact and must be corroborated. Thus, he argues, this inherent conflict between the accomplice instructions and CALJIC No. 2.27 must have confused the jury.

We have rejected similar claims in a number of recent cases. (*People* v. *Bunyard, supra,* 45 Cal.3d at p. 1230; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 782 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Odle* (1988) 45 Cal.3d

---

[12] In arguing against using CALJIC No. 3.12 to cure the trial court's misreading of CALJIC No. 3.11, defendant notes that in reading CALJIC No. 3.12 the court inadvertently used the word "may" in lieu of the word "must" in the first sentence of the third paragraph. (See fn. 8, *ante*.) We fail to see how this minor alteration could in any way have affected the jury's perception of its duties, particularly since the court provided the jury with a written copy of the instruction containing the proper language.

386, 409 [247 Cal.Rptr. 137, 754 P.2d 184]; *People* v. *Heishman* (1988) 45 Cal.3d 147, 177 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Chavez, supra,* 39 Cal.3d at pp. 829-832.) In the seminal case of *People* v. *Chavez,* we concluded that, in looking to the instructions as a whole, there was no reversible error where, as here, the jury is given CALJIC No. 3.11 and is instructed on the kind of evidence necessary to constitute corroboration, on the method of determining whether the accomplice's testimony was corroborated, on viewing an accomplice's testimony with distrust, and the parties proceed on the premise that corroboration is required.[13] (*People* v. *Chavez, supra,* 39 Cal.3d at pp. 830-831.)

Reiterating his earlier claim of error in the accomplice instructions, defendant attempts to distinguish his case from *Chavez*. He argues that because of the flaws the accomplice instructions could not be used to "cure" the effect of CALJIC No. 2.27 here. But, as we discussed previously, nothing in those instructions suggested to the jury that corroboration of the accomplice's testimony was unnecessary. A reasonable juror would have recognized CALJIC No. 2.27 as setting forth the general rule and the charge on accomplice testimony as an exception to it. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221].) Nothing before us indicates that the jurors may have acted otherwise.

4. *CALJIC No. 3.18—Viewing Accomplice Testimony With Distrust*

The trial court gave CALJIC No. 3.18 (1979 rev.), cautioning the jury to view accomplice testimony with distrust.[14] Defendant contends that, as with the instructions on accomplice corroboration, the court should have modified this instruction to also caution the jurors to distrust accomplice Sanders's out-of-court statements. Defendant further claims the possibility that the jurors may have accepted those statements at face value introduced an unacceptable level of unreliability into the subsequent penalty determination, because the jury might have considered the statements in making its penalty determinations. Therefore, he argues, the giving of the unmodified instruction constituted prejudicial error at both the guilt and penalty phases of the trial.

The instruction correctly told the jury to distrust accomplice Sanders's testimony. Although the instruction might appropriately have been

---

[13] We suggested in *Chavez* that in future cases involving accomplices, trial courts should modify CALJIC No. 2.27 by including an explicit reference to testimony requiring corroboration. The present version of CALJIC No. 2.27 includes such a reference.

[14] The instruction provided: "The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

modified by cautioning the jury to also distrust Sanders's out-of-court statements to the police, defendant did not request such a modification. ■ Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (*People* v. *Poddar* (1974) 10 Cal.3d 750, 760 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Forbs* (1965) 62 Cal.2d 847, 854 [44 Cal.Rptr. 753, 402 P.2d 825].) In any event, the reasons why Sanders's statements, both in and out of court, should be viewed with distrust were readily apparent to the jury. We conclude the failure to modify the instruction was harmless at both the guilt and the penalty phases.

## C. *Defendant's Motion for Cocounsel Status*

On June 8, 1982, the date of his initial appearance in superior court, defendant filed a written motion in propria persona asking to be appointed cocounsel so he could "assist the Chief-Attorney in matters of pretrial motions and trial strategy" and "locate and contact various defense witnesses." In support, defendant cited *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], which holds that an accused has a constitutional right to represent himself. However, defendant stressed in his motion he had no desire to proceed in propria persona or to act as chief counsel for the defense.

Defense counsel presented the motion to the superior court (Judge Leetham) at the commencement of the arraignment, suggesting the court might wish to rule on the motion immediately. In denying the motion, the court said: "Very well. The court has now read and considered the written presentation apparently made and typed by someone else other than the defendant, but nevertheless presented by the defendant. Motion for Co-Counsel denied." Judge Leetham arraigned defendant, and assigned the case to department 132 (Judge Munoz). Defendant then asked Judge Leetham to be heard on the cocounsel issue, and the following dialogue ensued:

"THE DEFENDANT: Am I not entitled to represent myself?

"THE COURT: Certainly. Do you want to represent yourself?

"THE DEFENDANT: I want to keep Mr. Lenoir as an attorney, but I would like to go co-counsel.

"THE COURT: I don't grant you that. Faretta versus California grants you the right to represent yourself as long as you know what you're doing, and anyone who wants to represent themself [*sic*] when a death penalty is possible I'm delighted to let them do it, but you'll not get co-counsel on a case like that, that is, you being co-counsel in status. You can represent yourself any time you're ready.

"You have one of the ablest counsel in the State . . . .

"THE DEFENDANT: I didn't say I want to get rid of him.

"THE COURT: Well, Faretta versus California doesn't have a group-type practice in mind, and I deny the motion for co-counsel status for yourself, but if you want to come back and get rid of Mr. Lenoir, please do so."

At defendant's next court appearance, Judge Munoz was apparently unavailable, and defendant made a brief appearance in department 133 (Judge Nelson) to set a date for pretrial motions. In renewing defendant's motion for cocounsel status, defense counsel informed the court: "Mr. Andrews has requested, and I request of the court, that he be permitted to have some sort of pro per status so that he can do some of his own assistance and research." The court denied the motion, saying: "Mr. Andrews, a murder case is not won by research. It's a matter of effort, you see. So, you have one of the best lawyers in town. He knows more law than you can study in a thousand years. It's all up there in his head. Every gray hair is a repository of the library code of legal knowledge. Taught me a lot of things when I was a lawyer, so forget it." Defendant made no further requests for cocounsel status.[15]

Defendant contends both Judge Leetham and Judge Nelson failed to exercise their discretion in ruling on his motions to act as cocounsel. Alternatively, he argues that, assuming discretion was in fact exercised, denial of the motions constituted an abuse of discretion.

■ Although under *Faretta, supra,* 422 U.S. 806, an accused has a constitutionally guaranteed right of self-representation, the Constitution affords no corresponding right to assist one's attorney as cocounsel. Rather, the determination whether to grant such a request is within the sound discretion of the trial court. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730]; *People v. Moore* (1988) 47 Cal.3d 63, 77-78 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People v. Johnson, supra,* 47 Cal.3d at p. 596; *People v. Miranda* (1987) 44 Cal.3d 57, 75-76 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Mattson* (1959) 51 Cal.2d 777, 789 [336 P.2d 937].)

In *People v. Hamilton, supra,* 48 Cal.3d 1142, we said that judicial discretion to grant a motion for cocounsel status is "sharply limited." (48 Cal.3d at p. 1162.) We explained: "We have consistently held that the court should

---

[15] We note that thereafter defendant made pretrial appearances before Judge Munoz. As the judge who presided over defendant's trial, Judge Munoz would have been in a better position than the arraigning judge to evaluate the merits of defendant's motion for cocounsel status. Defendant, however, made no attempt to renew the motion before Judge Munoz.

not do so except 'on a substantial showing . . . that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered, or delayed.' (*Mattson, supra,* 51 Cal.2d at p. 797; see also, e.g., *Moore, supra,* 47 Cal.3d at p. 78.) [¶] Undesirable tactical conflicts, trial delays, and confusion often arise when a defendant who has chosen professional representation shares legal functions with his attorney. [Citations omitted.] We therefore reaffirm that the court should not sanction such an arrangement except on a 'substantial' showing that it will promote justice and judicial efficiency in the particular case. Since defendant entirely failed to make such a 'substantial' showing here, there was no basis for exercise of the court's discretion. For this reason alone, defendant's motion was properly denied." (48 Cal.3d at p. 1162, fn. omitted.)

Here, defendant offered no explanation how a grant of cocounsel status would have enhanced his ability to assist in developing trial strategy and locating witnesses. Nor did he explain how increasing his access to the law library would in any way benefit his defense. He was represented by two attorneys who both participated extensively at trial, and he made no attempt to explain why they could not do the necessary legal research. Defendant has failed to make a substantial showing that granting him cocounsel status would have been in the interest of justice and judicial efficiency. Therefore, "there was no basis for exercise of the court's discretion," and denial of the motion was proper. (*People* v. *Hamilton, supra,* 48 Cal.3d at p. 1162.)

## D. *Trial Court's Comments on Cost of Trial*

During jury selection, the trial court on three occasions commented on the cost of the trial. The court made the comments in the course of stressing to the prospective jurors the importance of heeding its admonition that they not discuss the case with others or attempt to obtain law or evidence about the case outside the courtroom. The court explained that failure to comply with the admonition would require an expensive retrial.[16]

Defendant argues the expense of trial should not play a role in the determination of guilt, and therefore the court's comments were improper. (See

---

[16] In its first comment, the court told the entire panel of prospective jurors: "At between $3-4,000 a day to run this courtroom, you can imagine what it costs L.A. County." The second comment, heard by three jurors who ultimately were empaneled to sit on the case, was: "At a cost of between $300,000 to $400,000 a day to run this courtroom, you can imagine what it costs the taxpayers of L.A. County to have the case retried." The third comment, heard by two persons who later became jurors, was: "[I]t costs something like $3-$4,000 a day to run this courtroom."

*People* v. *Barraza* (1979) 23 Cal.3d 675, 685 [153 Cal.Rptr. 459, 591 P.2d 947]; *People* v. *Gainer* (1977) 19 Cal.3d 835, 852, fn. 16 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73].)

The defense did not object to any of the remarks. Even if we were to assume defendant's failure to object to the comments did not result in a waiver of the issue, there is no reasonable probability the statements could have improperly affected the jury's deliberations. The comments did not suggest to the jurors that they consider the cost of trial in their deliberations. The comments merely constituted an attempt by the trial court to stress the importance of obeying the court's admonitions.

### III.

### SPECIAL CIRCUMSTANCE ISSUES

#### A. *Defendant's Prior Murder Conviction*

In a separate proceeding held between the guilt and penalty phases of the trial, the jury found to be true the special circumstance allegation that defendant had previously been convicted of murder. (§ 190.2, subd. (a)(2).) Defendant was 16 when he committed the offense in 1967 in Alabama, where he was charged and convicted as an adult. Under Alabama law at that time, minors 16 to 18 years old came within the original jurisdiction of the adult criminal court. They could, however, be transferred to the juvenile court when it was "in the interest of justice and of the public welfare" to do so. (Code of Ala., tit. 13, § 363 (repealed).)[17]

Had defendant committed the murder in this state, California law would have permitted his being tried as an adult only if a juvenile court had found him unfit to be dealt with under juvenile court law. (Welf. & Inst. Code, § 707.) Defendant asserts that in 1967 most minors accused of murder in California were treated as juveniles.[18] ▉ He claims the use of his Ala-

---

[17]Since 1975, Alabama law has provided that such persons come within the original jurisdiction of the juvenile court. As in California, the prosecution may request a hearing to determine whether the minor should be transferred to the adult court for criminal prosecution. (Ala. Code §§ 12-15-1, 12-15-30, 12-15-34.)

[18]Defendant notes that in 1967 only seven out of one hundred and twenty-four petitions filed in juvenile court alleging homicide were referred to the adult court. (Bur. of Crim. Stats., Cal. Dept. of Justice, Crime & Delinquency in Cal. 1967, p. 238, table IX-13.) However, these figures are misleading, because they include minors who were charged with vehicular, voluntary and involuntary manslaughter (*id.* at p. 237). Such minors, unlike those who committed murder, would less likely have been found unfit. In addition, the statistics include murders committed by juveniles under the age of 16, who would have been ineligible to be tried as adults.

bama conviction to support the finding of a prior-murder special circumstance was improper under subdivision (a)(2) of section 190.2 and denied him equal protection.

1. *Statutory Interpretation*

The fact that a defendant was "previously convicted of murder in the first or second degree" establishes the existence of a special circumstance. (§ 190.2, subd. (a)(2).) "[A]n offense committed in another jurisdiction which if committed in California *would* be punishable as first or second degree murder shall be deemed murder in the first or second degree." (*Ibid.*, italics added.) Present section 190.2 was added by voter initiative in 1978. However, the language of subdivision (a)(2) of this death penalty statute is identical to that of subdivision (c)(5) of former section 190.2, which the Legislature enacted in 1977. (Stats. 1977, ch. 316, § 9, p. 1257.)

Defendant contends the statute's use of the word "would" instead of "could" manifests an intent to limit the special circumstance to those offenses which would, in his words, "without doubt have been punishable" as murder in California. Had he committed the offense here, defendant argues, it might or might not have been punishable as murder, depending on the determination at the fitness hearing. Thus, he concludes, since it is not clear he *would* have been punished for murder had he committed the offense in California, the use of his Alabama murder conviction to support the special circumstance finding was improper.

The language of the statute does not support defendant's interpretation. Defendant is attempting to characterize the words "would be punishable" as if they were synonymous with the term "would be punished." "Punishable" has been defined as "[d]eserving of or capable or liable to punishment; capable of being punished by law or right." (Black's Law Dict. (5th ed. 1979) p. 1110, col. 1.) The word does not denote certainty of punishment, but only the capacity therefor. Any minor between the ages of 16 and 18 who commits murder in California, and has been found unfit to be treated as a juvenile, can be tried and convicted as an adult and thus be liable to punishment as a murderer.

To accept defendant's statutory construction would mean that every time the prosecution alleged a murder conviction from a foreign jurisdiction, the trial court must determine whether the guilt ascertainment procedures of that jurisdiction afforded the same procedural protections as those in California. We do not read such a requirement into the statute.

In some states a defendant is not entitled to a preliminary hearing. (See *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586

P.2d 916]; Annot., Limitations on State Prosecuting Attorney's Discretion to Institute Prosecution by Indictment or by Information (1986) 44 A.L.R.4th 401.) In others, a jury consisting of fewer than 12 persons can determine guilt. (See *Williams* v. *Florida* (1969) 399 U.S. 78 [26 L.Ed.2d 446, 90 S.Ct. 1893].) In still others there is no fitness hearing to determine whether a 16 year old should be treated as an adult. While any one of these procedural differences might conceivably spell the difference between a murder conviction and some other result, nothing before us indicates that the Legislature, in enacting the 1977 death penalty legislation, or the electorate, in later duplicating its language, intended that the prosecution's ability to use convictions from other states should turn on such questions. Rather, it appears the intent was to limit the use of foreign convictions to those which include all the elements of the offense of murder in California, and defendant has failed to show otherwise.

Had defendant committed the murder in California at the age of 16, it *would* have been possible for him to have been convicted of murder as an adult. The offense thus "would be punishable" as murder if committed in California, within the meaning of section 190.2, subdivision (a)(2).[19]

2. *Equal Protection*

Defendant further contends that use of the prior Alabama murder conviction as a special circumstance denied him equal protection under both the state and the federal Constitutions. (U.S. Const., Amend. XIV; Cal. Const., Art. I, § 7.) As he notes, the first prerequisite to such a claim is a showing that "the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549], italics in original.) He argues the two similarly situated groups are capital defendants who at the age of 16 committed murder in California, and those who committed such a crime in either Alabama or another state with similar laws. He claims the two groups are treated unequally because the former was entitled to a fitness hearing while the latter was not.

---

[19] We express no views as to the validity of a prior-murder special-circumstance finding which is based on the conviction of a defendant under the age of 16 in a jurisdiction which permits such a minor to be tried as an adult. Nor need we consider the effect, if any, of article I, section 28, subdivision (f) of the state Constitution, which states in relevant part that "[a]ny prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." We have previously held that this provision does not apply to cases where, as here, the offenses were committed before the provision's enactment. (See *People* v. *Collins* (1986) 42 Cal.3d 378, 389, fn. 7 [228 Cal.Rptr. 899, 722 P.2d 173]; *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

In no two states is the process by which a conviction is obtained identical. This does not mean, however, that a violation of equal protection results when a conviction from a foreign jurisdiction and a California conviction for the same offense are accorded equal weight, and defendant cites no authority holding such treatment to be unconstitutional. We conclude that, as long as the guilt ascertainment process in the foreign jurisdiction is not in and of itself constitutionally flawed, there is no constitutional bar against treating a murder conviction from a foreign state in the same manner as a California conviction for the same offense.

### B. *Multiple Special Circumstances*

■ The jury found to be true 10 special circumstance allegations. They were: multiple-murder, robbery-murder, and prior-murder special circumstances as to each of the three counts of murder; and one rape-murder special circumstance. Defendant argues that two multiple-murder and two prior-murder special circumstances were duplicative, and therefore should be stricken. We agree. Under our holding in *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], only one multiple-murder and one prior-murder-conviction special circumstance should have been found to be true. (*Id.* at pp. 1273-1274; see also *People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433]; *Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871]; *California* v. *Ramos* (1983) 463 U.S. 992, 999 [77 L.Ed.2d 1171, 1179, 103 S.Ct. 3446].)

■ Defendant also claims that two of the three robbery-murder special-circumstance findings should be stricken as violative of section 654's prohibition against multiple punishment.[20] He argues that because each of the killings occurred in the course of one robbery—that of Wheeler—there was only one "course of conduct," which may not be "inflated" into three separate special circumstances. Defendant relies on the plurality opinion in *People* v. *Harris, supra,* 36 Cal.3d at pages 64-67, which suggests that a finding of multiple special circumstances arising out of the same course of conduct violates section 654. Recently, in *People* v. *Melton* (1988) 44 Cal.3d 713, 766 [244 Cal.Rptr. 867, 750 P.2d 741], we declined to follow the *Harris* plurality on this point, and held that section 654 will not bar consideration of the fact that a murder occurred in the course of both a burglary and a robbery.

Moreover, defendant's argument would fail even under *Harris, supra,* 36 Cal.3d 36. Defendant committed three separate acts of murder, each while

---

[20] Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

engaged in the commission of the same robbery. It is of no significance that each murder occurred in the course of the same robbery (Wheeler's). When a defendant entertains a single principal objective during an indivisible course of conduct, he may nonetheless be punished for multiple convictions if during the course of that conduct he committed crimes of violence against different victims. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 587 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) Similarly, here the jury could properly consider the fact that defendant committed each of the three murders in the course of a robbery, even if his single principal objective was to rob Wheeler.

## IV.

### PENALTY PHASE FACTS

At the penalty phase, the prosecution evidence consisted of a stipulation and two exhibits. The parties stipulated that defendant was born on July 2, 1950, and that he pled guilty in Alabama to the crimes of armed robbery in 1968, escape in 1969, and robbery in 1977. The two exhibits were photographs of two of the victims; they had been excluded from the guilt phase on the ground that they were unduly inflammatory.

The defense penalty phase evidence, admitted under stipulation, consisted of sworn statements describing the circumstances surrounding defendant's prior Alabama murder conviction. According to the statements, defendant and a 17-year-old companion, each of whom carried a gun, entered a grocery store and announced a robbery. When the store clerk placed his hand down the front of his apron, defendant's companion fired three gunshots, killing him.

## V.

### PENALTY PHASE ISSUES

A. *Effect of Added Special-circumstance Findings*

 Defendant argues his death sentence must be vacated because the jury was erroneously allowed to consider the duplicative multiple-murder and prior-murder-conviction special-circumstance findings. (See *ante*, at p. 224.) We disagree.

There was no attempt to exploit the findings at issue. Neither the court nor counsel stressed to the jury the number of special-circumstance

allegations found to be true at the guilt phase. In his closing argument, the prosecutor made only brief references to each category of special circumstance allegations found to be true.[21]

We also note that prior to the penalty phase, when the jury had to consider the truth or falsity of defendant's alleged prior murder conviction, it was instructed to make one finding as to the truth of the allegation, which was then applied to each of the three murder counts. This further reduced the likelihood that the jury would give any significant independent weight to the duplicative special-circumstance findings. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 151 [249 Cal.Rptr. 320, 756 P.2d 1348].) As in *People* v. *Allen, supra,* 42 Cal.3d at page 1282, and *People* v. *Williams* (1988) 44 Cal.3d 883, 951 [245 Cal.Rptr. 336, 751 P.2d 395], we conclude the error was harmless.

Defendant further contends CALJIC No. 8.84.1, which sets forth the factors the jury must consider in its penalty determination,[22] compounded the prejudicial effect of the duplicative special circumstances. Here, the relevant factors were: (a) the special circumstances found to be true, (b) defendant's violent criminal activity, and (c) his prior felony convictions. Defendant argues the instruction allowed the jury to consider the prior-murder-conviction special-circumstance finding under each of these three factors and the multiple-murder findings under the first two factors, thus compounding the prejudicial effect.[23]

■ There is no constitutional impediment to consideration of a defendant's prior murder conviction in relation to the three factors mentioned.

---

[21] Aside from reading to the jury CALJIC No. 8.84.1, which told the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true," the prosecutor's only reference to the special circumstances arose in this context: "You have found the special circumstance of multiple murders to be true beyond a reasonable doubt. You found the special circumstance of the robberies committed—excuse me—the murders committed during the commission of robberies to be true. [¶] You found the special circumstance of the murder of Patrice Brandon occurred during the commission of rape." Although the prosecutor reminded the jury that defendant had a prior murder conviction, he did not mention that it was a special circumstance.

[22] In pertinent part, CALJIC No. 8.84.1 asks the jury to consider: "(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied force or violence.

"(c) The presence or absence of a felony conviction."

[23] The trial court gave CALJIC 8.84.1 in its entirety. The instruction contained all of the factors set forth in section 190.3, including some clearly inapplicable to this case. Defendant contends the failure to delete such factors from the instruction was improper. We have previously rejected this claim (see *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105), and we decline defendant's invitation to reconsider our holdings in those cases.

(*People* v. *Malone* (1988) 47 Cal.3d 1, 46 [252 Cal.Rptr. 525, 762 P.2d 1249].) In *People* v. *Miranda, supra,* 44 Cal.3d at page 106, footnote 28, we recommended that the jury be informed that the violent crimes described in factor (b) do not include the circumstances of the capital offense itself. However, here there is no indication the trial court's failure to give such an instruction caused the jury to give additional weight to the multiple-murder special-circumstance findings. (See *People* v. *Caro* (1988) 46 Cal.3d 1035, 1063-1064 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1146-1147 [245 Cal.Rptr. 635, 751 P.2d 901].) Furthermore, in his closing argument, the prosecutor mentioned the multiple-murder special circumstance only in connection with his discussion of factor (a).

## B. *Instruction on Mercy*

▮ Defendant contends the trial court should have instructed the jury it had discretion to exercise mercy and reject the death penalty.

In *People* v. *Caro, supra,* 46 Cal.3d 1035, we rejected the defendant's contention that the jury had to be instructed it had "the power to exercise mercy." There, the trial court told the jury it could consider sympathy, and gave the jury "an expanded factor (k) instruction"[24] commending to its consideration certain aspects of the defendant's character and background based on the evidence presented. (46 Cal.3d at p. 1067.) We concluded the instructions could not have left the jury with any ambiguity regarding its power to consider mercy in its penalty determination. (*Ibid.*)

Unlike the situation in *Caro, supra,* 46 Cal.3d 1035, the trial court did not tell the jury it could consider sympathy.[25] As in *Caro,* however, the court gave an expanded factor (k) instruction, informing the jury it could consider "any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." Moreover, there was no suggestion in the arguments of either party that the jury could not consider mercy in determining penalty. In his closing argument, the prosecutor said:

---

[24] Section 190.3, factor (k) provides that at the penalty phase the jury must consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." In *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813], we said that trial courts instructing on this factor "should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' [Citation omitted.]"

[25] At the guilt phase, the trial court gave CALJIC No. 1.00, which tells the jury not to be "influenced by pity for a defendant or by prejudice against him," and not to "be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." At the penalty phase, however, the court did not give this instruction, nor did the court tell the jury to consider guilt phase instructions in its penalty determination.

"I'm sure [defense counsel] will ask you to show compassion on Jesse Andrews." He then urged the jurors not to do so, pointing out that defendant had shown no mercy for any of his victims. The prosecutor's remarks, in effect, acknowledged that the jury could consider compassion. We conclude the jury was not misinformed regarding its power to exercise mercy.[26]

## C. Sentencing Discretion

 The trial court gave a modified version of former CALJIC No. 8.84.2, which told the jury: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole. If you determine the aggravating and mitigating circumstances equal each other, you should impose a sentence of life without the possibility of parole." Defendant contends this language violates the Eighth and Fourteenth Amendments of the United States Constitution and the due process guaranties of the California Constitution, article I, sections 7 and 15.

As we explained in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), and elaborated upon in subsequent cases (notably *People* v. *Allen, supra,* 42 Cal.3d 1222), the challenged instruction might in two interrelated respects lead the jury to misunderstand its discretion and responsibility. First, the jury might be confused about the nature of the weighing process. "[T]he word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems

---

[26] Neither *Drake* v. *Kemp* (11th Cir. 1985) 762 F.2d 1449, nor *Moore* v. *Balkcom* (11th Cir. 1983) 716 F.2d 1511, relied upon by the dissent, in any way suggests the trial court must give any jury instructions regarding mercy. To the extent the dissent is asserting the jury must be instructed it is empowered to exercise mercy for reasons unrelated to the evidence, the argument is inconsistent with *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]. "An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. . . . [T]o the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.' [Citation omitted.]" (*Id.* at p. 543 [93 L.Ed.2d at p. 941] (plur. opn.); see *id.,* pp. 544-545 [93 L.Ed.2d at pp. 941-942] (conc. opn. of O'Connor, J.); see also *People* v. *Hamilton, supra,* 48 Cal.3d at p. 1182; *People* v. *Williams, supra,* 45 Cal.3d at pp. 1322-1323; *People* v. *Lucky* (1988) 45 Cal.3d 259, 297-299 [247 Cal.Rptr. 1, 753 P.2d 1052].)

appropriate to each and all of the factors he is permitted to consider. . . ." (*People* v. *Brown, supra,* at p. 541; *People* v. *Allen, supra,* at p. 1277.)

Second, the instruction's direction to the jury that it "shall" impose the death penalty if it concludes the aggravating circumstances outweigh the mitigating circumstances could "mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose." (*People* v. *Allen, supra,* 42 Cal.3d at p. 1277.) We explained in *Allen*: "Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion." (*Ibid.*) Quoting from *Brown, supra,* 40 Cal.3d 512, we said in *Allen*: " 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the "weighing" process, *he decides that death is the appropriate penalty under all the circumstances.* Thus *the jury, by weighing the various factors,* simply *determines under the relevant evidence which penalty is appropriate in the particular case.*' " (42 Cal.3d at p. 1277, italics added in *Allen*.)

We examine each case on its own merits to determine whether the jury might have been misled to the defendant's prejudice about the scope of its sentencing discretion. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1277; *People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

Here, the prosecutor made no remarks that might have misled the jury. The theme of his brief closing argument was that the crimes defendant had committed were heinous, there were no circumstances in mitigation, and the jury should have no compassion for defendant since defendant had shown no mercy for his victims. The prosecutor concluded that based on the evidence death was "the appropriate penalty." He never told the jury to engage in a mechanical counting of aggravating and mitigating circumstances. Nor did he tell the jury a sentence of death was mandatory if the circumstances in aggravation outweighed those in mitigation. The likelihood of improper counting of factors was further minimized by the following instruction to the jury: "One mitigating circumstance may outweigh several aggravating circumstances, or one aggravating circumstance may outweigh several mitigating circumstances. You shall give to each the

weight you find it to be entitled." Under the circumstances, the jury could not have been misled as to the scope of its sentencing discretion.

In support of his contention that the instruction was improper, defendant cites two recent federal cases, *Jackson* v. *Dugger* (11th Cir. 1988) 837 F.2d 1469 and *Adamson* v. *Ricketts* (9th Cir. 1988) 865 F.2d 1011. Defendant's reliance is misplaced.

In *Jackson,* the trial court instructed the jury: "When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided." (837 F.2d at p. 1473.) On appeal, the Eleventh Circuit held that this instruction violated the Eighth Amendment's prohibition against cruel and unusual punishment because it was "so skewed in favor of death that it fail[ed] to channel the jury's sentencing discretion appropriately." (*Jackson, supra,* 837 F.2d at p. 1474.)

In *Adamson,* the Ninth Circuit invalidated the Arizona death penalty statute, which provided that the trial court "shall impose a sentence of death if the court finds one or more of the aggravating circumstances [to be true] and . . . there are no mitigating circumstances sufficiently substantial to call for leniency." (Ariz. Rev. Stat. § 13-703; *Adamson, supra,* 865 F. 2d at p. 1042.) The *Adamson* court held that this provision imposed an unconstitutional presumption that death was the appropriate penalty unless the defendant could sufficiently overcome the presumption with mitigating evidence. This presumption, the court said, precluded the sentencing judge from giving the defendant the individualized sentencing determination to which he was constitutionally entitled. (*Adamson, supra,* 865 F.2d at p. 1042.)

The instruction in *Jackson* and the statute in *Adamson* suffer from a similar defect: in each the sentencing entity is told that a sentence of death is the norm, and that a lesser penalty may be imposed only if the defense presents sufficient mitigating evidence. In both instances, the accused bore the burden of demonstrating that death was not an appropriate penalty. In contrast, the instruction given here merely told the jurors that if they concluded the aggravating circumstances outweighed the mitigating circumstances, they were to impose a sentence of death; but if they determined the mitigating circumstances outweighed the aggravating circumstances, they were to impose a sentence of confinement in the state prison for life without the possibility of parole. Unlike the language involved in *Jackson* and *Adamson,* the language at issue here does not create a presumption in favor of death. (See also *People* v. *Robertson* (1989) 48 Cal.3d 18, 63-64, fn. 16 [255 Cal.Rptr. 631, 767 P.2d 1109].)

### D. *Reliability of Accomplice Testimony*

Accomplice Sanders testified at the guilt phase pursuant to a plea bargain under which he was to receive a sentence of 17 years to life in return for his pleas of guilty to three counts of second degree murder. Sentencing was postponed until the completion of defendant's trial. At the time of Sanders's guilty pleas, the prosecutor informed the trial court that Sanders had already given a statement which the prosecution believed to be the truth, and that the plea bargain would be conditioned on Sanders's testifying at defendant's trial to "what we believe to be the truth." When the court expressed concern about the propriety of such a condition, the prosecutor agreed the plea bargain would require only that Sanders "tell the truth" at defendant's trial.

Defendant argues that Sanders's testimony was too unreliable to be considered by the jury at the penalty phase. He claims Sanders's desire to obtain a favorable plea bargain furnished a motive to minimize his own culpability and to exaggerate defendant's. In addition, defendant urges the testimony was unreliable because the prosecutor's initial representation to the trial court, referred to above, put Sanders on notice that the prosecution would treat deviations from his earlier statement to the police as a breach of his promise to tell the truth. While defendant concedes Sanders's testimony might have been admissible at the guilt phase, he argues it should not have been considered at the penalty phase because it is insufficiently reliable to support the imposition of the death penalty. (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962, 96 S.Ct. 2978] (plur. opn.); *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 771 [175 Cal.Rptr. 738, 631 P.2d 446].) The argument lacks merit because Sanders's testimony was sufficiently reliable to be considered by the jury.

Defendant correctly concedes Sanders's testimony was admissible at the guilt phase. When a plea bargain requires a witness to testify in a particular fashion, the self-interest of the witness taints the testimony, rendering it inadmissible. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 768 [254 Cal.Rptr. 257, 765 P.2d 419]; see *People* v. *Fields* (1983) 35 Cal.3d 329, 360-361 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133].) However, here the agreement required only that Sanders tell the truth. We have held that such arrangements comply with due process. (*People* v. *Garrison, supra,* 47 Cal.3d at pp. 769-770; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1229 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Fields, supra,* 35 Cal.3d at p. 361.) With respect to defendant's claim that Sanders knew the prosecutor expected him to testify in a certain fashion, the plea bargain did not require Sanders to do so; it only required him to testify truthfully. (*People* v. *Garrison, supra,* 47 Cal.3d at p. 771.)

The analysis which supports the admission of Sanders's testimony at the guilt phase applies equally to the penalty phase. Defendant has cited no authority holding that the requirement of reliability in determining that death is the appropriate punishment would require the exclusion of evidence he admits is sufficiently reliable to be admissible as evidence of guilt. The jury properly considered Sanders's testimony at both phases of the trial.

### E. *Jury's Duty to Make Findings Beyond a Reasonable Doubt*

Defendant argues the trial court had a duty to instruct the jury on its own motion that before it could impose a sentence of death, it had to find *beyond a reasonable doubt* that (1) each aggravating factor upon which it relied was true, (2) the aggravating factors in the case outweighed the mitigating factors, and (3) death was the appropriate penalty. He claims the failure to so instruct the jury violated article I, sections 7(a) and 15 of the California Constitution and the Eighth and Fourteenth Amendments of the United States Constitution. We have rejected these contentions in the past. (See *People* v. *Kimble* (1988) 44 Cal.3d 480, 516 [244 Cal.Rptr. 148, 749 P.2d 803]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Williams* (1985) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 180 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn.).)

### F. *Age as an Aggravating Factor*

Defendant complains the jury instructions were deficient because they failed to state that defendant's age could be considered only in mitigation.

We rejected such a claim in *People* v. *Lucky, supra,* 45 Cal.3d at page 302, where we said: "It is true that 'mere chronological age *of itself* should not be deemed an aggravating factor.' (*Rodriguez, supra,* 42 Cal.3d at p. 789, italics added and deleted; . . .) By the same token, mere chronological age of itself should not be deemed a mitigating factor. Age alone is plainly 'a factor over which one can exercise no control' (*Rodriguez, supra,* at p. 789) and as such is not relevant to the issue of penalty. . . . [¶] In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case."

Defendant also contends the prosecution impermissibly argued age was an aggravating factor. However, the prosecutor never did so. Rather, he argued that a person 29 years old (defendant's age when he committed the offenses) cannot "turn around and tell you they don't know what they're doing," because "[s]omebody who is 29 is mature in chronological sense, and in the mental sense of the word; that is, he is, in fact, an adult. He knows better." Under *Lucky, supra,* 45 Cal.3d 259, the prosecutor's comments were proper.

## G. *Excusing Jurors for Cause*

The trial court excused 23 potential jurors for cause because of their conscientious scruples about the imposition of the death penalty. Although defendant does not claim the decision to excuse any of these potential jurors was necessarily improper, he does argue the court had a duty to instruct them it was their civic duty to sit as jurors if they could subordinate their personal beliefs and follow the court's instructions. He contends that without such an admonition the court had no basis to determine whether the reservations of any potential juror about the death penalty would prevent or substantially impair the performance of that individual's duties as a juror. We rejected an identical argument in *People* v. *Miranda, supra,* 44 Cal.3d at page 96, and *People* v. *Caro, supra,* 46 Cal.3d at page 1061.

## H. *Constitutionality of California Death Penalty Statute*

Defendant asserts the present California death penalty law (§ 190 et seq.) is unconstitutional because it fails: (1) to separately enumerate aggravating and mitigating factors, (2) to exclude nonstatutory aggravating factors as a basis for the death penalty, (3) to require written findings on the aggravating factors, (4) to require that aggravating factors be proved beyond a reasonable doubt, (5) to require that aggravating factors supporting a death verdict be found unanimously, and (6) to require "intercase" proportionality review. We rejected such a challenge in *People* v. *Allen, supra,* 42 Cal.3d at page 1285 (see also *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779), and will not reconsider it here.

## I. *Cumulative Effect of Penalty Phase Errors*

Defendant argues that the cumulative effect of errors committed at the penalty phase requires reversal of the death sentence. We disagree. One error occurred at the penalty phase when the jury considered the duplicative multiple-murder and prior-murder-conviction special circumstances. (See part V. A., *ante.*) There also was a minor error in the guilt phase

instructions on accomplice corroboration, which defendant claims prejudicially affected the penalty determination. (See part II. B., *ante*.) For the reasons we have already set forth, neither of these errors could have significantly influenced the jury's deliberations. Even when considered in combination, there is no reasonable possibility these errors could have affected the penalty verdict. (See *People* v. *Lucky, supra,* 45 Cal.3d at pp. 303-304; *People* v. *Malone, supra,* 47 Cal.3d at p. 56.)

## J. *Proportionality Review*

 Defendant claims his death sentence is disproportionate to his culpability because many homicides that are as serious as those he committed are punished less severely. He asks this court to conduct a comparative "intercase" sentence review for a determination that the penalty is impermissible as cruel or unusual punishment under article I, section 17 of the California Constitution. He further argues capital defendants are denied equal protection unless they receive the benefits of the "disparate sentence" statute, section 1170, subdivision (f).[27] We have rejected similar claims in a number of recent cases (see, e.g., *People* v. *Karis* (1988) 46 Cal.3d 612, 649 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1286-1288) and adhere to those decisions here.

The Eighth Amendment's cruel and unusual punishment clause does not require "intercase" proportionality review. However, the imposition of the death penalty is subject to "intracase" review under the cruel or unusual punishment provision of article I, section 17 of the California Constitution, applying the standards enunciated in *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-484 [194 Cal.Rptr. 390, 668 P.2d 697] and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921]. (*People* v. *Karis, supra,* 46 Cal.3d at p. 649.) We have reviewed this case and cannot conclude the penalty here is disproportionate to the offense or the offender. In an attempt to obtain drugs and money, defendant committed three cold-blooded killings. He beat all three victims, raped and sodomized one, and strangled two with wire coat hangers. Moreover, this is not the first time defendant has been involved in a robbery in which the victim was killed. Defendant's

---

[27] Section 1170, subdivision (f) requires the Board of Prison Terms to review every sentence imposed pursuant to the determinate sentencing law within one year to determine whether it is "disparate in comparison with the sentences imposed in similar cases." If the board finds a disparity, it must notify the sentencing judge, who is required to conduct a new sentencing hearing at which the board's finding is given "great weight." (*People* v. *Martin* (1986) 42 Cal.3d 437, 446 [229 Cal.Rptr. 131, 722 P.2d 905].) If the board's finding of disparity is upheld, the judge must recall his sentence " 'unless there is substantial evidence of [subjective] countervailing considerations which justify a disparate sentence.' " (*People* v. *Allen, supra,* 42 Cal.3d at p. 1286, quoting *People* v. *Martin, supra,* 42 Cal.3d at p. 448.)

argument that imposition of the death penalty is disproportionate to his culpability is devoid of merit.

The four duplicative multiple-murder and prior-murder special circumstances are ordered stricken. In all other respects, the judgment, including the sentence of death, is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt. After review, I can find no reversible error bearing on that issue.

I also concur in the judgment as to death-eligibility. To my mind, at least one of the special circumstance findings must be sustained. But as will appear, I disagree with the majority's discussion of one of defendant's claims relative to those findings.

I dissent, however, from the judgment as to penalty. In my view, the trial court committed prejudicial error by not instructing the jurors that they could exercise mercy and spare defendant's life.

I

Defendant contends that Penal Code section 190.2, subdivision (a)(2) (hereinafter section 190.2(a)(2)), the provision of the 1978 death penalty law defining the prior-murder-conviction special circumstance, denied him equal protection of the law under both the United States and California Constitutions. He bases his claim on an assertion that the statutory scheme under which he was tried and subsequently convicted, for a murder he committed at age 16 in Alabama, was different from the statutory scheme under which a similarly situated defendant would have been tried in California.

The majority reject the contention. I do as well. But their analysis leaves something to be desired. The short and sound answer to defendant's contention is that section 190.2(a)(2) does in fact treat similarly situated defendants similarly: the provision renders death-eligible both the defendant who has suffered a murder conviction here and the defendant who has suffered a murder conviction in another jurisdiction. The difference in treatment of which defendant complains is effected by the different statutory schemes under which different defendants were previously tried and convicted. That

difference is immaterial for purposes of equal protection analysis. What defendant seems to be attempting to raise is, strictly speaking, a claim of denial of due process—to wit, that his prior murder conviction does not properly come within the ambit of section 190.2(a)(2). He fails, however, to adequately support such a point. Therefore, the claim must be rejected out of hand.

## II

Defendant contends that the trial court committed prejudicial error by not instructing the jurors that they could exercise mercy and spare his life. I agree.

In modern Eighth Amendment jurisprudence, mercy is "one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life." (*Drake* v. *Kemp* (11th Cir. 1985) 762 F.2d 1449, 1460 (in bank).) "Just as retribution is an appropriate justification for imposing a capital sentence, [citation], a jury may opt for mercy and impose life imprisonment at will. The ultimate power of the jury to impose life, no matter how egregious the crime or dangerous the defendant, is a tribute to the system's recognition of mercy as an acceptable sentencing rationale." (*Ibid.*)

As used here, "mercy" is obviously not synonymous with or reducible to sympathy. Rather, it is the power to choose life over death—whether or not the defendant deserves sympathy—simply because life is desirable and death is not.

In a word, under the Eighth Amendment the jury has the absolute power to spare the defendant's life and may exercise that power with the utmost legitimacy. (See, e.g., *People* v. *Brown* (1988) 46 Cal.3d 432, 468 [250 Cal.Rptr. 604, 758 P.2d 1135] (conc. opn. of Mosk, J.) [observing after review of authorities that the jury has "absolute discretion to choose life"]; *Moore* v. *Balkcom* (11th Cir. 1983) 716 F.2d 1511, 1521 ["While discretion to impose the death penalty for any reason which might be capricious is denounced, [citation], it now appears that discretion to grant mercy—perhaps capriciously—is not curtailed."].)

It follows that at the penalty phase of a capital trial the court is obligated to instruct the jurors on mercy sua sponte. "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d

390]; accord, *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) Mercy, of course, is a general principle relevant to the ultimate issue raised in every capital case—whether or not the defendant is to pay the ultimate price.

In the case at bar, the trial court did not instruct the jurors that they could exercise mercy and spare defendant's life, even though in my view counsel effectively requested it to do so. Under the analysis set forth above, the omission was clearly error. My conclusion would perhaps be different if the instructions actually given at least impliedly advised that the exercise of mercy was legitimate. They did not. Incorporating as they did the penalty factors and the mandatory penalty-determination language of Penal Code section 190.3, they would have been understood by reasonable jurors to suggest that the exercise of mercy was in fact illegitimate.

The majority hold that the trial court did not in fact err. In support they assert, "the jury was not *misinformed* regarding its power to exercise mercy." (Maj. opn., *ante,* at p. 228, italics added.) They miss the point. The fact is, the jury was never *informed* by the court regarding that power. The majority seem to suggest that a certain comment in the prosecutor's argument was an adequate substitute for the instruction the court omitted. "But arguments of counsel cannot substitute for instructions by the court." (*Taylor* v. *Kentucky* (1978) 436 U.S. 478, 488-489 [56 L.Ed.2d 468, 477, 98 S.Ct. 1930].)[1]

In my view, the error cannot be deemed harmless. The omission of an instruction on mercy may well have contributed to the choice of penalty and thereby fatally tainted the verdict of death. As a result of that omission, the jurors were without instruction about mercy, "one of the most central sentencing considerations, the one most likely to tilt the decision in favor of life." (*Drake* v. *Kemp, supra,* 762 F.2d at p. 1460.) As a result of that omission, they were without direction about their "ultimate power . . . to impose life, no matter how egregious the crime or dangerous the defendant . . . ." (*Ibid.*) I recognize that defendant might well not have deserved sympathy in the eyes of the jurors. But I cannot conclude that they would not have shown mercy to him had they been instructed on their power to do so.

---

[1] In *People* v. *Caro* (1988) 46 Cal.3d 1035 [251 Cal.Rptr. 757, 761 P.2d 680], this court implied that the jurors in that case were effectively instructed that they could exercise mercy and spare the defendant's life because they were told they "could consider sympathy" and "also received an expanded factor (k) instruction, commending to [their] consideration specific aspects of defendant's character and background as shown by the evidence." (*Id.* at p. 1067.) In this case, however, the jurors were *not* told they could consider sympathy.

## III

For the foregoing reasons, although I concur in the judgment as to guilt and death-eligibility, I dissent as to penalty.

Appellant's petition for a rehearing was denied September 29, 1989, and the opinion was modified on September 28, 1989, to read as printed above.