Filed 2/3/16  P. v. Rew CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065909 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS240763) |
| TREVIYON DESHAWN REW, | ORDER MODIFYING OPINION |
| Defendant and Appellant. | [CHANGE IN JUDGMENT] |
| _____ | |

THE COURT:

It is ordered that the opinion filed herein on January 27, 2016, be modified as follows:

1.) On page 3, the third line from the bottom of the page, the phrase "and the firearm use enhancements under section 12022.53 subdivisions (d) and (e)(1) attached to counts 1 and 2," is added to the sentence that begins on that line, so that the sentence now reads:

> "We strike the gang enhancements on counts 1, 2 and 3 and the firearm use enhancements under section 12022.53 subdivisions (d) and (e)(1) attached to

counts 1 and 2, and remand the matter to the trial court with directions to resentence Rew."

2.)  On page 35, the following sentence is added to the end of the paragraph which begins on page 34.

"Because the firearm use enhancements under section 12022.53 subdivisions (d) and (e)(1) attached to counts 1 and 2 require a finding the defendant violated section 186.22 (§ 12022.53, subd. (e)(1)), those firearm use enhancements must also be stricken."

3.)  On page 36, the first sentence of the disposition is changed, so that it now reads:

"The gang enhancements on counts 1, 2 and 3 and the firearm use enhancements under section 12022.53 subdivisions (d) and (e)(1) attached to counts 1 and 2 are stricken and the court is directed to resentence Treviyon Deshawn Rew."

**This modification changes the judgment.**

BENKE, Acting P. J.

Copies to:  All parties

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TREVIYON DESHAWN REW,<br><br>    Defendant and Appellant. | D065909<br><br><br><br>(Super. Ct. No. SCS240763) |

APPEAL from a judgment of the Superior Court of San Diego County, Ana L. Espana, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Julie L. Garland, Assistant Attorneys General, Barry Carlton, Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Treviyon DeShawn Rew[1] of attempted murder (Pen. Code,[2] §§ 664/187, subd. (a); counts 1, 12, 13), carjacking (§ 215, subd. (a); count 2), assault with a firearm (§ 245, subd. (a)(2); counts 3, 8, 10, 15, 16), robbery (§ 211; counts 7, 9), attempted carjacking (§§ 664/ 215, subd. (a); count 14), possession of a concealed weapon (§ 12025, subd. (a)(2); count 17) and evading a peace officer (Veh. Code, § 2800.1, subd (a); count 18). The jury could not reach a verdict on robbery charges in counts 4, 5, and 6, and the court declared mistrials on those counts. The court granted the People's motion to dismiss count 11.

The jury made the following true findings: As to counts 1, 2, and 3, Rew acted for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)); as to counts 1, 2, 7, 9, 12, 13, 14, he was armed with a firearm (§ 12022, subd. (a)(1)); as to counts 1 and 2, he intentionally and personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and was a principal and at least one principal used a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)); and as to counts 7, 9, 12, 13, and 14, he intentionally and personally discharged a firearm. (§ 12022.53, subd. (c).) In bifurcated proceedings, the court found true an enhancement that Rew committed the crimes while he was out on bail. (§ 12022.1, subd. (b).) The

---

[1]     We grant Rew's unopposed request to correctly spell his name on the appellate case caption. On remand, the trial court is directed to do the same on the amended abstract of judgment.

[2]     Statutory references are to the Penal Code unless otherwise stated.

court sentenced Rew to a determinate term of 63 years eight months imprisonment plus an indeterminate term of 65 years to life.

Rew contends the trial court committed constitutional error by: (1) denying his motion to suppress evidence regarding his detention; (2) failing to sever the trial of counts 4 through 10 from counts 1 through 3 and counts 12 through 16; (3) failing to instruct the jury with an optional portion of CALCRIM No. 226 that stated the prosecution had granted leniency to two possible accomplices in exchange for their testimony; (4) failing to sua sponte modify CALCRIM No. 301 regarding corroboration of accomplice testimony; (5) failing to instruct the jury regarding limited purpose evidence (CALCRIM No. 303); and (6) instructing the jury regarding flight (CALCRIM No. 372). Rew further argues: (7) the court failed to sua sponte instruct the jury regarding the scope of the jury's use of his statements (CALCRIM No. 358) and corpus delicti (CALCRIM No. 359); (8) there was cumulative error; (9) insufficient evidence supported the gang enhancements in counts 1, 2 and 3 because there was an insufficient showing regarding the primary activities of the criminal street gang known as "5/9 Brim"; and (10) under *People v. Prunty* (2015) 62 Cal.4th 59, there was insufficient evidence that when he committed the underlying felony he—a 5/9 Brim gang member—had sought to benefit the Blood gang and thus the gang enhancements in counts 1, 2 and 3 must be stricken and the matter remanded for resentencing. We strike the gang enhancements on counts 1, 2 and 3 and remand the matter to the trial court with directions to resentence Rew. In all other respects the judgment is affirmed.

3

FACTUAL AND PROCEDURAL BACKGROUND

*Counts 1, 2, and 3* (*Attempted Murder of Sean Simpson*)

On July 22, 2010, at about 1:00 a.m., Sean Simpson parked his car at his apartment complex and got out of the car. Immediately afterwards, Rew pointed a gun in Simpson's face. Simpson told Rew to take the car, adding: "My bad, cuz." Rew replied, "Cuz what? I'm a Blood."[3] Simpson immediately lay face down on the ground in the hope his life would be spared, and in order to facilitate Rew's taking the car. A male entered the passenger side of Simpson's car and Rew entered the driver's side. Shortly afterwards, Rew and the person in the passenger seat both fired gunshots at Simpson. Simpson was in a coma for almost one month. Simpson was required to use a colostomy bag for one year. At the time of trial, Simpson still suffered numbness in his leg, and between seven to nine bullets and bullet fragments were lodged in his body. He could no longer fully carry out his previous job duties. Simpson identified Rew in a photo lineup.

_____

[3] At trial, the prosecutor asked San Diego Police Detective David Collins, who testified as a gang expert, "What about the term cuz and blood? If a cuz or Crip gang member walked up to a Blood and said, 'What up, cuz,' what would that mean to you? Detective Collins replied: "That's actually disrespect. It could be an open challenge at that point. . . . And something to that level, I would see [at] a bare minimum a physical response." Simpson testified he was not a gang member.

*Counts 4, 5, and 6* (*Robbery of Irish Tourists*)[4]

San Diego Police Detective Mary Grace Gibbins testified that on July 22, 2010, three female tourists were robbed of their cell phones and cameras at gunpoint as they stood outside a hostel in Ocean Beach. Approximately two weeks later, police recovered a digital camera belonging to one of the victims. Rew's pictures were among those found in the camera.

*Counts 12, 13, 14, 15, and 16* (*Crimes against Martin Rodriguez and Carlos Avila*)

Martin Rodriguez testified that on July 24, 2010, at approximately 2:00 a.m., after a night of drinking, he and Carlos Avila slept in Rodriguez's car. Rodriguez heard a banging on the car window and someone shouting, "Get the fuck out." Shortly afterwards, Rew fired a gunshot that shattered the car window, causing glass to hit Rodriguez's face. Rew demanded Rodriguez's car keys, which fell. Rew grabbed them, fired another shot, ran and drove away in a different car. One bullet was lodged in the roof of Rodriguez's car and narrowly missed Avila's torso, while another bullet, which matched that used by Rew's .38-caliber gun, was lodged in Avila's shoe.

*Counts 7, 8, 9 and 10* (*Robbery of Jesse Aceves and Manuel Cuevas*)

Jesse Aceves testified that on July 24, 2010, at approximately 3:00 a.m., finding no hotel in San Diego, he and Manuel Cuevas stopped in National City and slept in the car they had been driving. Aceves heard a noise and woke up. Rew pointed a gun at Aceves, and ordered him out of the car. Rew hit Aceves in the face with the gun,

---

4 Although the jury deadlocked on these charges, we mention the underlying facts here to evaluate the trial court's decision to deny Rew's motion to sever the charges.

demanded money, fired a shot to the side of Aceves's head, and fired two more shots to the ground. Rew also demanded Cuevas's money. Rew took approximately $3,000 from the victims, their cell phones, a laptop and Cuevas's passport.

*Count 17* (*Possession of a Concealed Weapon*)

On July 25, 2010, at approximately 8:55 p.m., San Diego Police Officer Mario Perez and his partner were on patrol when Officer Perez saw Rew quickly walking away from a Mazda and looking nervous upon seeing the police. Officer Perez exited his vehicle and talked to Rew. Rew put his hand in his right front shorts pocket. Officer Perez decided to pat down Rew for weapons and found in Rew's right front pocket a Taurus revolver that was loaded with five .38-caliber bullets. Officer Perez handcuffed Rew. Police later ascertained the Mazda belonged to Rew's great-great-grandfather who, along with Rew, gave police permission to search it. In the Mazda, police found a loaded .45-caliber Sig Sauer semiautomatic weapon, a cell phone and a camera.

*Count 18* (*Evading a Peace Officer*)

On July 28, 2010, San Diego Police Officer Tobia Terranova responded to a police call regarding a suspect travelling in a vehicle. Officer Terranova saw the suspect car, activated his overhead lights and siren, and followed it. Rew disregarded several traffic signs as he led police on a high speed chase. Eventually, Rew stopped the car in the middle of the road, got out, ran over fences and eluded the police. Rew ended up at the home of his good friend, David Ruiz, and told him he had just crashed a car in a high-speed chase. Hours later, police found Rew hiding in Ruiz's home. Police arrested both Rew and Ruiz, but never charged Ruiz.

6

Ruiz testified that in July 2010, Rew said he had shot someone who referred to Rew as "cuz," which Rew, as a Crip gang member, disliked. Ruiz knew Rew was calling people on the telephone and asking them to hide guns. Rew also was selling a cell phone, and Ruiz's relative, Daniel Camargo, bought the phone. One day, Rew went to Ruiz's house wanting to take some pictures with a camera, including pictures of Rew with a gun on his person. Ruiz had told police that he had seen Rew carry a .38-caliber gun, and another friend of Rew's carried a gun that looked like a .22-caliber pistol. Ruiz said he believed Rew belonged to the 5/9 Brim gang.

*Police Investigation*

National City Police Sergeant Derek Aydelotte investigated the attempted murder of Simpson, and learned Rew had recently been arrested in a Mazda vehicle. Pursuant to a warrant, Officer Aydelotte searched Rew's residence and found a key to Simpson's Toyota, Cuevas's passport, a sawed-off shotgun that was chambered with 30-30 rounds of ammunition and a box of .25-caliber ammunition. Officer Aydelotte learned of the Ocean Beach robbery, and saw photographs of Rew taken with a stolen camera. In one photo, Rew posed with a large amount of cash.

Salvador Moreno, with the aid of surveillance video footage showing Moreno in different stores, testified that on different occasions in July 2010, Rew gave him money to buy ammunition for Rew's different caliber weapons, including .25-caliber and 30-30 bullets. One day, Moreno saw Rew with a .38-caliber revolver in his pocket. Rew told Moreno that he had chopped the stalk of a rifle for ease of carry and for it to cause more damage. Moreno stated Rew was a member of the 5/9 Brim gang. Moreno identified a

7

vehicle that Rew drove, which Rew had described as "hot," meaning it was stolen. On July 27, 2010, Rew called Moreno and said, "Know who this is? I don't want to say any names. They got a video of someone buying bullets."

On cross-examination, Moreno testified police contacted him on July 27, 2010, and he was concerned he was a suspect in the criminal matters involving attempted robbery, carjacking, and robbery, but he was not arrested. Moreno testified that for the past two and a half years the district attorney had paid for his rent, utility expenses, food, clothes, and phone bill. On redirect examination, Moreno testified that the district attorney's payments were occasioned by his having to relocate due to safety concerns.

DISCUSSION

I.

*Motion to Suppress Under Section 1538.5*

Rew contends his Fourth Amendment rights were violated when the trial court denied his suppression motion because Officer Perez did not have a reasonable suspicion he was engaged in criminal activity nor probable cause to search him. Rew contends that all convictions except count 18 rely on the evidence seized and therefore must be reversed.

A. *Background*

Rew moved pretrial to suppress the evidence found in the Mazda, including the loaded Taurus revolver, the loaded .45-caliber Sig Sauer pistol, and cell phones, arguing, "Rew standing near a car, walking away at the sight of the police and putting his hand in his pocket did not provide reasonable articulable suspicion."

8

At the suppression motion hearing, Officer Perez testified that he had been a police officer since 2007. On the night of July 25, 2010, he and his partner were patrolling the area of 3800 Newton, a high crime San Diego neighborhood. He saw Rew standing near a Mazda, and then walking away quickly and nervously upon noticing the police vehicle. Officer Perez got out of his vehicle and in a friendly manner asked to talk to Rew, who immediately replied that he was not on probation. Rew put his hand in his shorts pocket. Officer Perez asked Rew to remove his hands from his pockets, and Rew complied. Officer Perez asked Rew if he had anything illegal on his person, and Rew again said that he was not on probation. Officer Perez thought Rew's comments regarding probation were unusual. Officer Perez overheard his partner talking to another passenger in the Mazda regarding a screwdriver, and believed Rew had been tampering with the Mazda. Officer Perez asked to pat down Rew for weapons and proceeded to do that. He found a loaded revolver in Rew's right front shorts pocket, and therefore handcuffed him. Afterwards, Rew and the car's owner authorized the officers' search of the Mazda, where they found the Sig Sauer and other items.

After hearing arguments from the parties, the court denied Rew's motion to suppress because Officer Perez's explanation of the circumstances set forth above that led up to Rew's putting his hands in his pockets, "at a minimum, whether or not sufficient to detain at that point, legally enable[d] Officer Perez to pat down Mr. Rew which resulted in the finding of the gun. [¶] I think once that occurred there was clearly a basis to detain. Actually, discovery of the gun makes it probable cause to arrest at that point which I think also justified the search of the vehicle based on a probable cause search, but

9

also the court will indicate there's been sufficient evidence establishing consent to search the car as well."

B. *Legal Principles*

1. *Fourth Amendment Standard of Review*

" 'In reviewing a suppression ruling, "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found." ' [Citation.] [¶] Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. 'As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' [Citation.] We review its factual findings ' " 'under the deferential substantial-evidence standard.' " ' [Citation.] Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court's ruling.' [Citation.] Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*People v. Tully* (2012) 54 Cal.4th 952, 979.)

We apply federal constitutional standards in assessing the reasonableness of governmental seizures. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.) "On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of

10

the trial court's *reasons* for reaching its decision." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145 (*Letner*).) Accordingly, if the trial court's ruling is correct " ' "upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976; *Letner*, at p. 145.) "In evaluating whether the fruits of a search or seizure should have been suppressed, we consider only the Fourth Amendment's prohibition on unreasonable searches and seizures." (*People v. Brendlin* (2008) 45 Cal.4th 262, 268.)

The legal principles governing detentions are well established. The U.S. Supreme Court first addressed this issue in the seminal case of *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), where it held courts must "evaluate the reasonableness of a particular search or seizure in the light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: [W]ould the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (*Terry*, at pp. 21-22, fn. omitted.) A detention is permissible under the Fourth Amendment if the officer can point to specific and articulable facts that, when considered together with rational inferences from those facts, provide an objective manifestation that the person detained has been, is, or is about to be, engaged in criminal activity. (*U.S. v. Cortez* (1981) 449 U.S. 411, 417-418 & fn. 2; *Terry*, at p. 21; *Letner*, *supra*, 50 Cal.4th at p. 145.) In determining whether reasonable suspicion is present, the totality of the circumstances, or the whole picture, must be considered. (*U.S. v. Cortez*, at p. 417.)

11

There are two elements of the totality of the circumstances determination, each of which must be met to find reasonable cause to detain. (*U.S. v. Cortez*, *supra*, 449 U.S. at p. 418.) The first is that the determination must be based on all of the circumstances and information, including information from police reports, objective observations, and consideration of the modes and patterns of certain criminals. (*Ibid*; *People v. Souza* (1994) 9 Cal.4th 224, 237.) Based on this information, law enforcement officers are permitted to draw inferences that "might well elude an untrained person." (*U.S. v. Cortez*, at p. 418; *U.S. v. Arvizu* (2002) 534 U.S. 266, 273; *Letner*, *supra*, 50 Cal.4th at p. 146.) The second element is that this determination must raise a suspicion that the particular individual being stopped is involved in the criminal activity. (*U.S. v. Cortez*, at p. 418.) Reasonable suspicion may not be based on a mere hunch (*Terry*, *supra*, 392 U.S. at p. 27), but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." (*U.S. v. Arvizu*, 534 U.S. at p. 274.)

Conduct consistent with innocent behavior can nonetheless provide reasonable suspicion of criminal activity when the acts are taken together. (*U.S. v. Sokolow* (1989) 490 U.S. 1, 9; *Terry*, *supra*, 392 U.S. at p. 22; *Letner*, *supra*, 50 Cal.4th at p. 146; *In re Tony C.* (1978) 21 Cal.3d 888, 894.) The California Supreme Court has held that innocent explanations of conduct do not preclude the possibility of finding reasonable suspicion, as a " 'principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . .' " (*People v. Souza*, *supra*, 9 Cal.4th at p. 233; *Letner*, at p. 148.) "Indeed, the United States Supreme

12

Court has acknowledged that by allowing the police to act based upon conduct that was 'ambiguous and susceptible of an innocent explanation,' the court in *Terry* 'accept[ed] the risk that officers may stop innocent people.' " (*Letner*, at p. 147.)

These principles are demonstrated in *Terry* itself. There, an officer patrolling a downtown street in the middle of the day saw two men engaging in arguably innocent behavior: taking turns walking up and down a street, pausing and looking into a specific store window, and conferring with each other and a third man in between turns. (*Terry*, *supra*, 392 U.S. at pp. 5, 6.) The officer "had never seen the two men before, and he was unable to say precisely what first drew his eye to them." (*Id.* at p. 5.) However, as a detective who had patrolled for 30 years in the area looking for shoplifters and pickpockets, the officer suspected the two men of " 'casing a job, a stick-up' " and consequently approached them, identified himself as an officer, asked their names and grabbed one of the men, patting down the outside of his clothes. (*Id.* at pp. 5, 7.) The officer discovered guns in both suspects' pockets and arrested them, after which they were charged with carrying concealed weapons. (*Id.* at p. 7.)

One of the suspects, Terry, moved to suppress evidence of the gun, contending the "frisk" was an unreasonable search and seizure. The court found that the officer's conduct was lawful and affirmed the conviction. It held there is a right to stop and frisk "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous[.] . . . [H]e is entitled for the protection of himself and others in the area to conduct a carefully limited search of the

13

outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is reasonable under the Fourth Amendment, and any weapons seized may be properly introduced in evidence against the person from whom they were taken." (*Terry*, *supra*, 392 U.S. at pp. 30-31.)

In *Terry*, the officers' safety was a key consideration: "[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." (*Terry*, *supra*, 392 U.S. at p. 24.) The court concluded: "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (*Ibid.*)

C. *Analysis*

We conclude that the fact Officer Perez was patrolling the high crime neighborhood at night and saw Rew nervously leave the Mazda upon catching sight of the police vehicle provided reasonable suspicion for Officer Perez to approach Rew and ask to talk to him. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124.) When Officer Perez later overheard his partner speaking to Rew's companion about the screwdriver, Officer Perez became specifically concerned about a possible vehicle theft. During the ensuing conversation, Rew had his hands in his pockets, posing a possible threat to the

14

officer. Therefore, at that point he had a reasonable basis for conducting the *Terry* pat down search of Rew.

In short, in this case, a "reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger," permitting both Rew's detention and a reasonable search for weapons. (*Terry*, *supra*, 392 U.S. at p. 27; *People v. Glaser* (1995) 11 Cal.4th 354, 364 [the government interest of officer safety will justify a detention].) Although the above-mentioned facts, either by themselves or combined in some fashion, may not have alerted an untrained civilian, Officer Perez was permitted to draw inferences based upon his years of experience as a police officer. (*U.S. v. Cortez*, *supra*, 449 U.S. at p. 418; *U.S. v. Arvizu*, *supra*, 534 U.S. at p. 273.) Under all of the circumstances, Officer Perez's suspicion rose beyond a mere hunch. (*U.S. v. Cortez*, at pp. 417-418 & fn. 2; *Terry*, at p. 21.)

## II.

### *The Court Did Not Err by Denying Rew's Severance Motion*

Rew contends that when the court declined to sever the trial of counts 4 through 10 from that of counts 1 through 3 and counts 12 through 16, it violated his Fourth Amendment rights to due process and a fair trial, thus requiring reversal of his convictions on all counts except counts 17 and 18.

A. *Background*

Before trial, Rew moved to sever the charges under section 954, arguing the evidence supporting counts 1 through 3 and 12 through 16 was stronger, and involved the more serious and inflammatory charges of attempted murder and carjacking. By contrast,

15

counts 4 through 10 were for robbery, assault with firearm, carrying a concealed weapon and evading a police officer, for which the prosecution had "little direct evidence," "other than tenuous circumstantial evidence and the evidence which tends to prove stronger counts."

After evaluating the section 954 criteria, the trial court denied Rew's motion: "And what we have here are charges—crimes charged against the defendant, which are of the same class. And that they are assaultive crimes against the person: attempt murder, robbery, carjacking, so forth. [¶] But what we also have here is the close time frame within which the offenses are alleged to have been committed, essentially a crime spree within three days, which shows a continuing course of criminal conduct. [¶] Also, looking at the facts and circumstances of the events charged here, the crimes alleged to have been committed have common characteristics or attributes and some of the evidence is admissible to support all four charges. [¶] So, for example, all of the charges involve the use of a handgun. Mr. Simpson, counts 1 through 3, describe[s] the handgun. . . . [W]e know that a .38-caliber was used in counts 12 to 16. All the offenses occurred in the early morning hours, generally between 1:00 a.m. and 5:00 a.m."

The court continued: "So the evidence starts connecting up on July 25th when the defendant is arrested, and he is found carrying the loaded gun, which matches the gun used in counts 12 through 16 and the same gun type as described by the victim in counts 1, 2, and 3. [¶] The defendant is found with the camera, which belongs to the victims in counts 4 through 8. [¶] And then the search warrant of the defendant's home on July 30th resulted in law enforcement finding the passport of the alleged victim in counts 7

16

through 11.  [¶]  So I see the connecting of the dots, so to speak, in looking at the totality of the circumstances as to what occurred in those three days."

The court rejected Rew's argument that the stronger charges were being joined to weaker ones:  "[T]he fact that evidence against the defendant on some of the counts consists of eyewitness statements and on other counts is circumstantial, I don't believe establishes improper consolidation of the charges.  Direct evidence is neither inherently stronger nor inherently weaker than circumstantial evidence.  Nor do I believe the consolidated charges are unusually likely to inflame the jury against the defendant.  [¶] The strength of the evidence as to each of the counts shows that we are not dealing with weak charges being joined with stronger charges so as to alter the outcome of some or all of the charged offenses."

B.  *Legal Principles*

"Section 954 provides that '[a]n accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.'  Even where the statutory requirements for joinder are satisfied, however, 'a trial court has discretion to order that properly joined charges be tried separately.' "  (*People v. Scott* (2015) 61 Cal.4th 363, 395.)

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' "  (*People v. Scott*, *supra*, 61 Cal.4th at p. 395; *People v. Trujeque* (2015) 61 Cal.4th 227, 259.)  " 'A unitary trial requires a single courtroom, judge, and court

17

attach[és]. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process.' " (*People v. Soper* (2009) 45 Cal.4th 759, 772.) "For these and related reasons, consolidation or joinder of charged offenses 'is the course of action preferred by the law.' " (*Ibid.*)

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; *People v. Lucky* (1988) 45 Cal.3d 259, 276.) Consolidation or joinder is generally preferred by the law because it promotes efficiency. (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.)

Nevertheless, " '[r]efusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; [or] (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges . . . .' " (*People v. Scott*, *supra*, 61 Cal.4th at

p. 396.) "If the evidence underlying the joined charges would have been cross-admissible at hypothetical separate trials, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 38.)

"In determining whether denial of the severance motion was an abuse of discretion, we examine the record before the trial court at the time of its ruling." (*People v. Scott*, *supra*, 61 Cal.4th at p. 396.) To establish an abuse of discretion in this context, Rew "must make a clear showing of prejudice . . . ." (*Ibid*.) We first decide whether the statutory requirements for joinder are met, and then assess whether the trial court properly determined that joinder would not prejudice Rew. (*Id.* at p. 395; *People v. Lucky*, *supra*, 45 Cal.3d at pp. 276-277.)

C. *Analysis*

We conclude the court did not err by consolidating the charges, which with the exception of the concealed weapon and evasion of a peace officer counts, involved assaultive conduct that Rew committed over a three-day span. As the court explained, the evidence relating to the different crimes was cross-admissible. Specifically, police found at Rew's home evidence relating to Simpson's car and Cuevas's passport. The photos in the camera also showed Rew displaying some money, which the jury reasonably could conclude was part of the approximately $3,000 that Rew had robbed from Aceves and Cuevas. Further, Moreno's testimony and the video surveillance tapes established that Moreno bought for Rew different caliber ammunition matching the weapons that Rew used in the different crimes. Under *People v. Merriman, supra,* 60

19

Cal.4th at p. 38, the cross-admissibility of evidence alone sufficed to justify the trial court's decision to deny Rew's motion to sever. We discern no prejudice to Rew from the joinder of the charges.

III.

*The Court Did Not Err by Failing to Instruct the Jury With CALCRIM No. 226*

Rew contends the court erroneously excluded from its instruction with CALCRIM No. 226—regarding how to evaluate witness testimony—an optional section of the form instruction stating: "[Was] a witness promised immunity or leniency in exchange for his or her testimony?" He claims that Ruiz received a benefit from the People, who declined to prosecute him despite his initial arrest and threats of punishment from both the police and the prosecutor. Rew further contends that Moreno was treated leniently because he was never arrested and no charges were pending against him for aiding and abetting Rew in several of the offenses, despite his repeatedly buying ammunition for Rew. In addition, for two and a half years, the People paid Moreno's rent and paid for his food, clothing and other expenses.

A. *Background*

In discussing CALCRIM No. 226, the court asked the parties whether it should include in its instruction any of the optional sections of the form instruction: "In looking at all of the brackets again, I didn't see anything else that made sense. Anybody else? Defense counsel clarified, "On [CALCRIM No.] 226, your honor?" The court confirmed it was referring to CALCRIM No. 226, and defense counsel stated, "Yes. No."

20

The court's instruction with CALCRIM No. 226 provided the jury with certain criteria for evaluating witness testimony, including: "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?"

In light of the trial testimony set forth above, defense counsel challenged Ruiz's credibility during closing argument: "David Ruiz admitted to all of us that during that period in 2010, he was almost always drunk and on drugs as much as he could get, whenever—wherever he could get it. And yet . . . [the prosecutor] is asking us to take Mr. Ruiz's testimony as gospel, as if nobody can question what he is saying here. And [Ruiz] went on on my inquiry to concede that he only told the police whatever he thought they wanted him to tell them. He wasn't interested in the truth. He was interested in just placating his inquisitors who, incidentally, threatened to take his son away from him. [¶] Now, that's a pretty serious matter and one that also enters into the calculus of the credibility of Mr. David Ruiz."

Defense counsel highlighted Moreno's ties to the district attorney: "[Moreno] has been supported by the district attorney for the last three-plus years—and who knows how much longer—to the tune of over a thousand dollars a month. One suspects that that's the best money he has ever seen, at least legally. And in addition to his being an accomplice, as I pointed out earlier, that has to influence his testimony. He knows what side his bread is buttered on."

B. *Applicable Law*

"Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) In determining whether instructional error was harmless, "[a] reviewing court considers 'the specific language challenged, the instructions as a whole[,] the jury's findings' [citation], and counsel's closing arguments to determine whether the instructional error 'would have misled a reasonable jury.' " (*People v. Eid* (2010) 187 Cal.App.4th 859, 883.)

C. *Analysis*

On appeal, Rew contends the issue was not forfeited, claiming that defense counsel confusingly replied to the trial court, "Yes. No." Contrary to Rew, we do not detect that defense counsel was confused. Understood in context, defense counsel, having ascertained that the court was referring to CALCRIM No. 226, affirmed that information by saying, "Yes." He immediately proceeded to answer the court's question regarding whether it should include the other optional materials by saying, "No." We therefore conclude this claim is forfeited. The defense declined the court's opportunity to request more specific instruction with any other bracketed portion of CALCRIM No. 226. Therefore, Rew may not claim error on appeal. (Accord, *People v. Jennings* (2010) 50 Cal.4th 616, 675 [noting that a standard jury instruction can amount to a pinpoint instruction and finding forfeiture in defendant's failure to request the pinpoint instruction].)

22

In any event, any error was harmless. The court's instruction informed the jury to consider whether Ruiz and Moreno were biased because of their personal relationship with Rew. Further, the jury heard testimony regarding the prosecutor's supposed leniency toward Ruiz and Moreno, a point that defense counsel reiterated during oral argument. Nonetheless, the jury convicted Rew based on the overwhelming evidence of his guilt: As to counts 1 to 3, Simpson identified Rew in a photo lineup, and his car key was found at Rew's house. As to counts 7 through 10, police found Cuevas's passport at Rew's house, and photos retrieved from the stolen camera of Rew posing with a large amount of cash, possibly that stolen from Aceves and Cuevas. As to counts 12 through 16, the bullet lodged in Avila's shoe matched that of Rew's gun. As to count 17, the police found the concealed weapon during the pat down of Rew. The evidence supporting the evading a peace officer charge was based on the police officer's description of Rew's clothes, which matched that found at Ruiz's house upon Rew's arrest. Therefore, we conclude it was not reasonably probable that if the court had instructed regarding leniency or bias Rew would have received a more favorable outcome.

IV.

*The Court Did Not Err by Failing to Modify CALCRIM No. 301*

Rew contends the trial court erroneously failed to sua sponte modify CALCRIM No. 301—providing that the testimony of a single witness suffices to prove any fact—to match its instruction with CALCRIM No. 334, which included language cautioning the jury that if it found Ruiz or Moreno were accomplices, their testimony required

23

corroboration. Rew concludes that the jury "received conflicting instructions on whether corroboration of an accomplice-witness's testimony was required, and it is impossible to tell which instruction the jury relied on."

A. *Background*

The court instructed the jury with this version of CALCRIM No. 301: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The court did not include a prefatory optional portion of the form instruction excluding accomplice testimony: "Except for the testimony of [insert witness's name] which requires supporting evidence [if you decide (he/she) is an accomplice[.]]" (CALCRIM No. 301 (2015 ed.).)

The court instructed the jury with CALCRIM No. 334, which states in part: "A person may be an accomplice even if he or she is not actually prosecuted for the crime. [¶] If you decide that a witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her testimony as you would that of any other witness. [¶] If you decide that a witness was an accomplice, then you may not convict the defendant of attempted murder, robbery, or carjacking based on his or her testimony alone. You may use the testimony of an accomplice to convict the defendant only if [¶] 1. The accomplice's testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's testimony; [¶] and [¶] 3 That supporting evidence tends to connect the defendant to the commission of the crimes. [¶] . . . [¶] . . . Any testimony of an accomplice that tends to incriminate the defendant

24

should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that testimony the weight you think it deserves after examining it with care and caution in the light of all other evidence."  (Some capitalization omitted.)

Defense counsel argued to the jury that Ruiz and Moreno were likely accomplices, whose testimony should be viewed with caution:  "Now at some point we have to get to the personages of David Ruiz and Salvador Moreno.  Their testimony, according to [the prosecutor], is linked even to the Simpson incident, getting ammunition and so on.  [¶] Now, these are a couple of characters who are almost, obviously, accomplices of whoever committed these crimes.  They readily traded known or suspiciously obtained stolen merchandise among each other.  They are out buying ammunition.  I didn't hear anything about going hunting here or target shooting.  This is gang land.  That ammunition was for evil purposes.  [¶]  So what does that make them if they are accomplices?  Well, according to the [jury] instruction . . . their testimony is to be 'viewed with caution.'  You don't hear that about other types of witnesses, but accomplice testimony by the law is to be viewed with caution.  That means you have your suspicions about it going in, and you are invited to follow those suspicions and disregard the substance of their testimony."

Defense counsel next clarified his point by reading a portion of CALCRIM No. 334 verbatim for the jury and explained:  "So my point is that the fact, if you find it to be a fact, that's something that you have to do as a preliminary determination, that either or both of Ruiz and Moreno are accomplices not only challenges your acceptance of the truth of their testimony, but also enters into your determination of whether the crimes were even committed by Mr. Rew."

25

In rebuttal argument, the prosecutor said: "The discussion about Mr. Ruiz and Mr. Moreno being accomplices. What crimes are they accomplices to? Sure. It's suspicious. You are buying bullets for a gangster friend of yours. You know he is probably up to no good. But to call somebody an accomplice is—you can't just say well, he might have been up to no good so I will buy a lot of bullets, therefore, I'm an accomplice. [¶] There is no testimony, no evidence that Mr. Ruiz or Mr. Moreno knew anything about the Simpson case or the Ocean Beach case, or any of the other cases. Mr. Moreno was just some willing friend to do whatever [Rew] wanted for a couple of bucks and change. And even then, he wasn't friendly with Mr. Rew's friends. Mr. Rew was just using him so Mr. Rew didn't have to go in there and buy the bullets and be on camera. Mr. Moreno was just along for the ride. . . . [¶] The law says if they are accomplices, then you need more than just their word to support a conviction of the defendant. You need corroboration because the law says look: You should look suspiciously at someone else's statement if they are also part of a crime. Makes sense. [¶] So what else do you look at? You look at what evidence supports what that supposed accomplice is saying. Mr. Moreno, it's easy. He is on videotape doing exactly what he said he did. Mr. Ruiz, it's easy. He is giving phones that belong to the victims. That's corroboration."

B. *Applicable Law*

The California Supreme Court rejected a similar argument raised in reference to the predecessor instructions to CALCRIM Nos. 301 and 334 (CALJIC Nos. 2.27 and 3.11 respectively): "In the seminal case of *People v. Chavez* [(1985) 39 Cal.3d 823] we concluded that, in looking to the instructions as a whole, there was no reversible error

26

where, as here, the jury is given CALJIC No. 3.11 and is instructed on the kind of evidence necessary to constitute corroboration, on the method of determining whether the accomplice's testimony was corroborated, on viewing an accomplice's testimony with distrust, and the parties proceed on the premise that corroboration is required. [Citation.] [¶] . . . [Nothing] in those instructions suggested to the jury that corroboration of the accomplice's testimony was unnecessary. A reasonable juror would have recognized CALJIC No. 2.27 as setting forth the general rule and the charge on accomplice testimony as an exception to it. [Citation.] Nothing before us indicates that the jurors may have acted otherwise." (*People v. Andrews* (1989) 49 Cal.3d 200, 216- 217, overruled on other grounds in *People v. Trevino* (2001) 26 Cal.4th 237, 243-244.)

C. *Analysis*

"[I]n determining the correctness of jury instructions, we consider the instructions as a whole." (*People v. Friend* (2009) 47 Cal.4th 1, 49.) We examine "whether there is a reasonable likelihood that the jury misconstrued or misapplied" the instructions. (*People v. Clair* (1992) 2 Cal.4th 629, 663). We presume the jury consists of "intelligent persons who are fully able to understand, correlate and follow the instructions given to them." (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.) Absent some affirmative indication in the record to the contrary, and here there is none, we presume the jury followed the instructions given. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

We conclude that under *People v. Andrews*, *supra*, 49 Cal.3d 200, Rew's claim lacks merit. Based on the foregoing, we may presume that the jury knew that CALCRIM No. 334's instruction that accomplice testimony would require corroboration would be an

27

exception to CALCRIM No. 301's instruction that the testimony of only one witness suffices to prove a fact. In any event, as shown in the arguments of the parties, the issue of whether Ruiz and Moreno were accomplices was squarely presented to the jury, and they could evaluate that matter in reaching their verdict. Finally, in light of the overwhelming evidence of his guilt set forth above, Rew has not shown that the instructions misled the jury such that there was a reasonable probability of a more favorable result if the judge had instructed the jury with a modified version of CALCRIM No. 301.

V.

*The Court Did Not Err by Failing to Instruct the Jury With CALCRIM No. 303*

Rew contends that the court prejudicially erred by failing to instruct the jury with CALCRIM No. 303, which states: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other." Rew points to five instances where the court stated that it was permitting admission of hearsay evidence specifically for the effect it had on the witness: (1) Camargo testified Ruiz telephoned him saying that a friend had a cell phone for sale; (2) Detective Cameon testified Ruiz told him Camargo bought a cell phone from Rew; (3) San Diego Police Officer Kevin Speicher testified the Irish tourists told him someone pointed a gun at them and stuck a gun in one of their cheeks before robbing them; (4) Officer Perez testified he heard his partner ask the other passenger in the Mazda about a screwdriver; and (5) Detective Aydelotte testified Rew had a vehicle with him when he was arrested on July 25, 2010.

28

We conclude that any error was harmless because the court stated in open court that each of the different testimonies was admitted for the limited purpose of evaluating the effect it had on the listener. At any rate, as noted, overwhelming evidence supported Rew's convictions and he was not reasonably likely to get a different outcome if the court had separately instructed the jury with CALCRIM No. 303 regarding the limited purpose testimony.

VI.

*The Court Did Not Err by Instructing the Jury With CALCRIM No. 372*

Rew contends the court prejudicially erred by instructing the jury with CALCRIM No. 372 regarding flight, pointing out that the People had withdrawn their request for this instruction. Rew contends there was no evidence he fled after the incidents charged in counts 1 through 3, 7 through 10, and 12 through 16, and the instruction "therefore allowed the jury to find an element of the count 18 offense based on the instruction rather than the evidence. This, in turn, lessened the prosecution's burden of proof." The People argue the evidence showed the manner in which Rew fled the scene after robbing Rodriguez and Avila evinced flight.

A. *Background*

At trial, the prosecutor withdrew a request for instruction with CALCRIM No. 372; nevertheless, the court gave the jury that instruction: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of

29

that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

B.  *Analysis*

Even if we were to agree that instructing the jury with CALCRIM No. 372 under the circumstances of this case was error, as the California Supreme Court has repeatedly held, the giving of the instruction would be harmless as the "instruction did not assume that flight was established, leaving that factual determination and its significance to the jury." (*People v. Visciotti* (1992) 2 Cal.4th 1, 61; see *People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183.)  The flight instruction does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof, and is proper.  (*People v. Avila* (2009) 46 Cal.4th 680, 710.)  We are bound to follow the California Supreme Court's firmly established precedent in this regard; thus, we likewise reject Rew's claim.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Moreover, when a trial court gives a legally correct but inapplicable instruction, the error " 'is usually harmless, having little or no effect "other than to add to the bulk of the charge." ' "  (*People v. Lee* (1990) 219 Cal.App.3d 829, 841; cf. *People v. Visciotti, supra,* 2 Cal.4th at p. 61 [even if flight instruction should not have been given, it was clearly harmless].)  Such is the case here.

30

# VII.

## *The Court Did Not Err by Failing to Sua Sponte Instruct the Jury with CALCRIM No. 358 or CALCRIM No. 359*

Rew contends the court committed reversible error as to all counts except count 17 because it failed to instruct the jury sua sponte with CALCRIM No. 358[5] regarding the use the jury could make of his statements or CALCRIM No. 359[6] regarding the requirement of corpus delicti for admissions. Rew specifically points to Ruiz's testimony that the morning after Simpson was shot Rew said he had shot a man who had "cuzzed" him; Moreno testified that the day after Simpson was shot Rew described the car he had

---

[5]     CALCRIM No. 358 states:  "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session).  You must decide whether the defendant made any (such/of these) statement[s], in whole or in part.  If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to such statement[s].  [¶]  [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

[6]     CALCRIM No. 359 states:  "The defendant may not be convicted of any crime based on (his/her) out-of-court statement[s] alone.  You may rely on the defendant's out-of-court statements to convict (him/her) only if you first conclude that other evidence shows that the charged crime [or a lesser included offense] was committed.  [¶]  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.  [¶]  This requirement of other evidence does not apply to proving the identity of the person who committed the crime [and the degree of the crime].  If other evidence shows that the charged crime [or a lesser included offense] was committed, the identity of the person who committed it [and the degree of the crime] may be proved by the defendant's statement[s] alone.  [¶]  You may not convict the defendant unless the People have proved (his/her) guilt beyond a reasonable doubt."

31

driven as being "hot," meaning it was stolen; and Moreno said Rew said he had "chopped the stock" of a 30-30 gun so he could "carry it around and do damage."

## A.

The California Supreme Court holds that the trial court is not required to sua sponte instruct with CALCRIM No. 358. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) Further, when, as here, the court instructs the jury with CALCRIM No. 226 regarding witness credibility, the jury is adequately warned to view the witness's testimony with caution. (*People v. Diaz*, at p. 1196.) Here, any error related to the court's failure to sua sponte instruct with CALCRIM No. 358 was not prejudicial because of the overwhelming evidence of Rew's guilt as set forth above.

## B.

Any failure to instruct the jury with CALCRIM No. 359 regarding corpus delicti was subject to harmless error analysis under state law and therefore is not prejudicial "if there appears no reasonable probability the jury would have reached a result more favorable to defendant had the instruction been given." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1181; *People v. Watson* (1956) 46 Cal.2d 818, 835-836.) "[T]he modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues. [Citations.] If, as a matter of law, this 'slight or prima facie' showing was made, a rational jury, properly instructed, could not

32

have found otherwise, and the omission of an independent-proof instruction is necessarily harmless." (*Alvarez*, at p. 1181.)

Here, we conclude that the court's failure to instruct the jury with CALCRIM No. 359 was harmless because the jury was presented with independent evidence of Rew's criminal conduct. Specifically, Simpson identified Rew as his assailant, and related that he had referred to Rew as "cuz." Further, in a Walmart surveillance video, Rew is seen driving Simpson's vehicle. This evidence corroborated Ruiz's statements that Rew had said he shot a man who referred to him as "cuz," and Moreno's statement that Rew had described a car as "hot" or stolen. In light of this evidence, the court did not err by failing to instruct the jury with CALCRIM No. 359.

## VIII.

### *There Was no Cumulative Error*

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

However, as discussed *ante*, since we have found none of Rew's claims of error prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict in this case. (*People v. Martinez* (2003) 31 Cal.4th 673, 704.)

IX.

*The Gang Enhancements Must be Stricken*

The People concede and we agree insufficient evidence regarding the primary activities of the 5/9 Brim street gang supported the true findings on the section 188.22 enhancements in counts 1, 2 and 3.

Detective Collins provided the only testimony minimally responsive to the issue of the 5/9 Brim gang's primary activities. The prosecutor asked him on direct examination: "Are you familiar with the types of crimes that members of the 5/9 Brim gang have been known to commit pursuant to Penal Code section 186.22?" He replied: "Yes, I've investigated a variety of different crimes." Detective Collins proceeded to testify regarding a series of predicate crimes committed by other 5/9 Brim gang members, but he did not explain the gang's primary activities.

"Substantial evidence does not mean any evidence, or a mere scintilla of evidence. It is 'evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*In re. Alexander L.* (2007) 149 Cal.App.4th 605, 614 ["The evidence presented in this case on the issue of whether Varrio Viejo was a gang within the meaning of section 186.22 does not meet this standard. Therefore, the true finding as to the gang enhancement allegation must be reversed."] " 'Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities.' [Citation.] Such evidence alone, however, is '[n]ot necessarily' sufficient to establish the 'primary activities' requirement." (*People v.*

34

*Vy* (2004) 122 Cal.App.4th 1209, 1223.)  Likewise, here we conclude the gang enhancements must be reversed because of insufficient evidence to support them.

In light of our resolution of this matter, we need not reach Rew's other contention under *People v. Prunty*, *supra*, 62 Cal.4th 59, that insufficient evidence supported the finding regarding a connection between the 5/9 Brim gang and the Blood gang to sustain the true findings on the gang enhancements in counts 1, 2 and 3.

DISPOSITION

The gang enhancements on counts 1, 2 and 3 are stricken and the court is directed to resentence Treviyon Deshawn Rew.  The judgment is otherwise affirmed.  The trial court is directed to amend the abstract of judgment to reflect the resentencing, correctly spell Rew's surname, and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.

36